## S90G1000. ATLANTA OBSTETRICS & GYNECOLOGY GROUP et al. v. ABELSON et al.
### (398 SE2d 557)

FLETCHER, Justice.

After their infant daughter, Brittany, was born with a genetic chromosomal disorder called Down's Syndrome, Mr. and Mrs. Abelson (hereinafter "plaintiffs") brought suit against Dr. William Tippins and his associates, Atlanta Obstetrics & Gynecology Group, (hereinafter "defendants") who provided Mrs. Abelson with postconception obstetrical care and treatment.

Suit was filed by plaintiffs, individually and as representatives of their infant daughter, alleging that defendants failed to properly counsel Mrs. Abelson, who was 37 years of age at the time of Brittany's birth, concerning the risks of her pregnancy associated with her increased maternal age and failed to inform her concerning the availability of a postconception diagnostic test called amniocentesis.[1] Defendants deny these allegations and assert that full information was given to plaintiffs.

Plaintiffs, individually, sought general and special damages for expenses related to: pregnancy and delivery; pain and suffering; mental and emotional anguish; lost wages; loss of consortium; and the "reasonable and necessary costs of rearing, educating and otherwise providing for Brittany including medical expenses."

In their capacity as representatives of their infant daughter, plaintiffs sought damages for Brittany's pain and suffering; her lost capacity to earn wages; as well as "reasonable and necessary costs of rearing, educating and otherwise providing for herself including medical expenses."

The defendants filed, among other things, a motion to dismiss the complaint, as well as a motion in limine to limit the scope of recoverable damages. Looking to *Fulton-DeKalb Hosp. Auth. v. Graves,* 252 Ga. 441 (314 SE2d 653) (1984), for guidance, the trial court granted the defendants' motion to dismiss as to that portion of the complaint filed by plaintiffs in their capacity as the legal representatives of Brittany, on the ground that a wrongful life action is not maintainable under Georgia law. The trial court, however, denied the defendants' motion to dismiss as to that portion of the complaint

---

[1] Amniocentesis is said to be highly reliable in ascertaining whether a fetus is afflicted with Down's Syndrome.

filed by plaintiffs in their individual capacities, on the ground that a wrongful birth action is maintainable under Georgia law.

In ruling on the motion in limine, the trial court held that plaintiffs may recover special and general expenses relating to pregnancy and delivery, as authorized by *Graves*. The trial court held that plaintiffs' claim for damages for their own mental pain and suffering was barred by the "impact rule" which requires that "there must have been actual bodily contact with plaintiff[s] as a result of defendant[s'] conduct for a claim for emotional distress to lie." *Ob-Gyn Assoc. v. Littleton*, 259 Ga. 663, 665 (386 SE2d 146) (1989).

Citing *Graves* and wrongful birth cases decided in other jurisdictions, the trial court held that plaintiffs may recover extraordinary child-care expenses necessitated by Brittany's special condition and, notwithstanding the general rule that a parent's legal duty to support a child terminates when the child reaches the age of majority, the trial court also held that these extraordinary expenses may be recovered beyond her age of majority if plaintiffs can prove that Brittany will be unable to maintain herself and is likely to become a public charge.[2]

The trial court declined to adopt defendants' argument that plaintiffs' recovery of damages for extraordinary child-care expenses should be offset by the emotional benefits of parenthood.

On interlocutory appeal of the issues involving the "wrongful birth" action, the Court of Appeals also held that, under the authority of *Graves* and wrongful birth cases decided in other jurisdictions, such an action is indeed maintainable under Georgia law. *Atlanta Obstetrics &c. Group v. Abelson*, 195 Ga. App. 274, 274-278 (1) (392 SE2d 916) (1990). The Court of Appeals further agreed with the trial court that extraordinary child-care expenses are recoverable by plaintiffs in a wrongful birth action. Id. at 278-279 (2).

The Court of Appeals, however, reversed the trial court's ruling that would have potentially allowed a recovery of extraordinary child-care expenses for Brittany's entire life. The Court of Appeals fashioned a novel set of criteria under which plaintiffs in a "wrongful birth" action may recover these extraordinary expenses "to the extent that the life expectancy of the child coincides with the life expectancies of [the plaintiffs]." 195 Ga. App. at 279 (3). In so holding, the Court of Appeals agreed with the trial court that the plaintiffs here may recover post-majority child-care expenses even though the reasoning used by the Court of Appeals differed from that of the trial

---

[2] As authority, the trial court cited OCGA § 19-11-43 (2), which is a provision of the Child Support Recovery Act imposing a child-support obligation for the support of a child 18 years of age or older "whenever the child is unable to maintain himself and is likely to become a public charge."

court.[3]

The Court of Appeals also affirmed the rulings of the trial court that the "impact rule" barred the "wrongful birth" plaintiffs' recovery of damages for their own mental pain and suffering and that the extraordinary child-care expenses should not be offset under the "emotional benefits" rule. Id. at 280-281 (7) and at 279-280 (4, 5).

At the outset, it is necessary to distinguish between a "wrongful birth" action, a "wrongful life" action and a "wrongful pregnancy" action. A "wrongful pregnancy" action is typically brought by the parents of a child whose conception or birth is due to a physician's negligent performance of a sterilization or of an abortion. In *Graves*, 252 Ga. at 443, this court aligned itself with the vast majority of other jurisdictions in holding that such an action may be brought as "no more than a species of malpractice." The recovery of the plaintiff/parents in *.Graves*, however, was limited to the general and special damages incurred during the pregnancy of the mother and the delivery of the child. The lion's share of damages sought by the plaintiff/parents, those related to the ordinary cost of raising the child, were not allowed. As we said in *Graves*:

> [i]n evaluating a claim for the cost of rearing a child we must consider the value which our society places upon human life in general and on the lives of children in particular. We instinctively recoil from the notion that parents may suffer a compensable injury on the birth of a child. *Graves*, 252 Ga. at 443.

"Wrongful birth" and "wrongful life" actions are both species of malpractice claims wherein relief is sought for allegedly negligent or intentional treatment or advice that has deprived the parents of the opportunity to abort a fetus and thereby avoid the birth of an impaired child. An action for "wrongful life" is brought on behalf of an impaired child and alleges basically that, but for the treatment or advice provided by the defendant to its parents, the child would never have been born. An action for "wrongful birth" is brought by the parents of an impaired child and alleges basically that, but for the treatment or advice provided by the defendant, the parents would have aborted the fetus, thereby preventing the birth of the child.

Virtually all courts that have been presented with the question of

---

[3] The Court of Appeals held that post-majority expenses may be recovered in this case under the authority of Georgia statutory law obligating a parent to support an adult child who is a pauper or is completely destitute. OCGA § 36-12-3; *C & S Nat. Bank v. Cook*, 182 Ga. 240 (185 SE 318) (1936); but see *Crane v. Crane*, 225 Ga. 605, 606-607 (1) (170 SE2d 392) (1969) (refusing to recognize an exception to the general rule in the case of an adult child who is mentally ill, in that there is no statutory authorization).

whether or not to recognize a "wrongful life" action have answered in the negative.[4] However, in answer to the question of whether or not to recognize a "wrongful birth" action, the majority of courts that have addressed the question have answered in the affirmative. See generally Annotation, Tort Liability for Wrongfully Causing One to Be Born, 83 ALR3d 15 (1978). In spite of the widespread recognition and, in fact, because of that recognition and the confusion which has followed in its wake, we hold that "wrongful birth" actions shall not be recognized in Georgia absent a clear mandate for such recognition by the legislature.[5]

An analysis of traditional tort law principles, even as applied in an age of ever advancing medical technology, simply does not authorize a finding that a physician, who has provided postconception prenatal care to an expectant mother, should be held liable, even to a limited extent, tor an impairment which the child unquestionably inherited from her parents and an impairment which was already in

---

[4] The rationale underlying the near universal refusal to recognize "wrongful life" actions was recognized by the Court of Appeals of New York in one of the earlier cases to address the question:

> However, there are two flaws in plaintiffs' claims on behalf of their infants for wrongful life. The first . . . is that it does not appear that the infants suffered any legally cognizable injury. . . . Whether it is better never to have been born at all than to have been born with even gross [impairments] is a mystery more properly left to the philosophers and theologians. Surely the law can assert no competence to resolve the issue, particularly in view of the very nearly uniform high value which the law and mankind has placed on human life, rather than its absence. . . . There is also a second flaw. . . . Simply put, a cause of action brought on behalf of an infant seeking recovery for wrongful life demands a calculation of damages dependent upon a comparison between the Hobson's choice of life in an impaired state and nonexistence. This comparison the law is not equipped to make. *Becker v. Schwartz*, 386 NE2d 807, 812 (N.Y. 1978).

[5] Legislation has been enacted in at least seven states, and introduced in at least 21 others, barring or limiting "wrongful birth" actions, sometimes in spite of the fact that the particular state's courts have previously addressed the question and have chosen to recognize the existence of such actions. See Note, *Wrongful Birth Actions*, 100 Harv. L. Rev. 2017, 2019 (n. 7, 9) (1987); see also Me. Rev. Stat. Ann. tit. 24, § 2931 (3) (1987); Pa. Const. Stat. Ann. § 8305 (1988).

A valid concern underlying the legislative curtailment of "wrongful birth" actions is the probability that "wrongful birth" claims will give rise to increased medical malpractice litigation, with obstetricians' liability exposure being so broad as to inhibit the practice of obstetrics and thereby damage the public good. See also *Hickman v. Group Health Plan, Inc.*, 396 NW2d 10, 13 (1) (Minn. 1986).

Although no such legislation has been enacted in Georgia, in its 1990 session, the General Assembly did enact a statute establishing a gubernatorial commission to investigate an "obstetrical crisis," OCGA § 9-9-84 (c), created by "a significant decrease in the number of physicians who practice obstetrics" in this state. OCGA § 9-9-84 (a) (2). This commission is to report its findings and recommendations on or before December 1, 1990. OCGA § 9-9-84 (c).

The enactment of OCGA § 9-9-84 provides added proof to us that there needs to be a thorough assessment of all of the public policy considerations involved in recognition of "wrongful birth" actions as well as a prospective establishment of the contours of the action, if it is to be recognized in this state. Such a task is best suited to the legislature.

existence when the parents first came into contact with the physician.

The first two prongs of the four-pronged traditional tort analysis,[6] those of duty and breach, do not present so great a problem in that a physician has been recognized to have a generalized duty to impart relevant information to a patient concerning his or her medical condition, see *Goldberg v. Ruskin*, 471 NE2d 530, 537 (7) (Ill.App. 1st Dist. 1984); 61 AmJur2d 358, Physicians, Surgeons, and Other Healers, § 229 (1981), and a woman has been recognized, under *Roe v. Wade*, 410 U. S. 113 (93 SC 705, 35 LE2d 147) (1973), to have a constitutional right to "make an informed decision regarding the procreative options available to her." *Smith v. Cote*, 513 A2d 341, 346 (3) (N.H. 1986).

Where the traditional tort analysis begins to break down is with the third prong, that of injury. In order to satisfy that prong, we must recognize the life of the child as the injury which has been inflicted upon plaintiffs by the defendants. As the Supreme Court of North Carolina announced in their seminal decision on "wrongful birth:" "[w]e are unwilling to take any such step because we are unwilling to say that life, even life with severe [impairments], may ever amount to a legal injury." *Azzolino v. Dingfelder*, 337 SE2d 528, 534 (N.C. 1985); see also *Graves*, 252 Ga. at 443.

The traditional tort analysis breaks down even further with the final prong, that of causation, as the defendants cannot be said to have caused the impairment in Brittany.

> The [impairment] is genetic and not the result of any injury negligently inflicted by the [defendants]. In addition it is incurable and was incurable from the moment of conception. Thus the [defendants'] alleged negligent failure to detect it during prenatal examination cannot be considered a cause of the condition by analogy to those cases in which the doctor has failed to make a timely diagnosis of a curable disease. The child's [impairment] is an inexorable result of conception and birth. *Becker*, 386 NE2d at 816 (Wachtler, J., dissenting).

The only damages which can even be alleged by the plaintiffs are those which have arisen from the defendants' alleged failure to take steps which the plaintiffs now say would have led them to abort a

---

[6] As recognized in *Lininger v. Eisenbaum*, 764 P2d 1202, 1205 (1) (Colo. 1988):

To state a claim sounding in tort upon which relief may be granted, a complaint must identify (1) a legal duty the defendant owes to the plaintiff, (2) the defendant's breach of that duty, and (3) an injury to the plaintiff that is (4) proximately caused by the defendant's breach. W. Prosser & W. Keeton, *The Law of Torts*, 164-65 (5th ed. 1984).

fetus, to whose existence and to whose impaired condition the defendants in no way contributed.

Jurisdictions which have recognized "wrongful birth" actions have all faced the troublesome question of what damages to allow and, despite the concerted efforts of many of the finest legal minds in the country, there is, after more than a decade of wrestling with the issue, no clear consensus as to what approach to take with respect to recoverable damages. Traditionally, tortfeasors are liable for all of the reasonably foreseeable results of their negligent acts or omissions but such is not the case in actions for "wrongful birth." "[F]ew if any jurisdictions appear ready to apply this traditional rule of damages with full vigor in wrongful birth cases." *Azzolino*, 337 SE2d at 534.

Courts that have recognized the cause of action have generally allowed recovery of the extraordinary costs of rearing the impaired child. However, these same courts have generally not allowed recovery of the ordinary costs of rearing the child even though the ordinary costs are just as foreseeable as the extraordinary and even though the awarding of one without the other requires a contortion of the traditional rule of recoverable damages that defies all logic and explanation. See *Abelson*, 195 Ga. App. at 281-284 (Beasley, J., dissenting in part).

The "extraordinary cost" rule has been described as a "special rule" of damages applied in "wrongful birth" actions because of the perceived need to ameliorate the otherwise harsh consequences that would result from a strict application of the "avoidable consequences" rule.[7] However, courts recognizing "wrongful birth" actions are not in agreement as to whether plaintiffs may recover the extraordinary costs that will be incurred after the child reaches the age of majority.

Nor are courts in agreement as to whether to allow recovery for the mental pain and suffering of plaintiffs in wrongful birth actions. If recovery is allowed, there are many different reasons given, just as there are many different reasons given for denying recovery of such damages.

Courts in jurisdictions which have recognized "wrongful birth" actions have also "been unable to reach anything resembling a con-

---

[7] As stated in *Smith v. Cote*, 513 A2d at 349:

The "avoidable consequences" rule . . . specifies that a plaintiff may not recover damages for "any harm that he could have avoided by the use of reasonable effort or expenditure" after the occurrence of the tort. Rigidly applied, this rule would appear to require wrongful birth plaintiffs to place their children for adoption. See Note, *Wrongful Birth: The Avoidance of Consequences Doctrine in Mitigation of Damages*, 53 Fordham L.Rev. 1107 (1985). Because of our profound respect for the sanctity of the family, [cit.], we are loathe to sanction the application of the rule in these circumstances. If the rule is not applied, however, wrongful birth plaintiffs may receive windfalls. Hence, a special rule limiting recovery of damages [to extraordinary child-rearing expenses] is warranted.

sensus as to whether damages . . . should be reduced or offset by any emotional or other benefits accruing to the parents by reason of the life, love and affection of the [impaired] child." *Azzolino*, 337 SE2d at 534 (3); see also Collins, *An Overview and Analysis: Prenatal Torts, Preconception Torts, Wrongful Life, Wrongful Death and Wrongful Birth: Time for a New Framework*, 22 J.Fam.L. 677 (1983-1984).[8]

And last, but certainly not least, is the unresolved problem brought about by the fact that, because actions for wrongful life have generally not been allowed, recovery of extraordinary child-care expenses has not been allowed by or on behalf of the child; only the parents are typically allowed to recover such damages. Any recovery of extraordinary child-care expenses should be for the sole purpose of guaranteeing the welfare of the child, however, once parents have obtained recovery of such expenses, there is no assurance that the funds will be expended on behalf of the child. These same concerns have been expressed by the Supreme Court of Kansas in *Arche v. United States Dept. of Army*, 798 P2d 477, 486-487 (Kan. 1990).

Justice Six, in his concurrence to the majority opinion in *Arche*, noted that the majority did "not go far enough in its effort to protect any [wrongful birth] damage award from possible unjust use." *Arche*, 798 P2d at 487 (Six, J., concurring). Justice Six proposed that:

> [w]e should judicially craft this new claim so that its characteristics require: (1) any sums recovered as damages by the parents for wrongful birth to be placed in a reversionary trust for the use and benefit of the child; and (2) the parents to stand in a fiduciary relationship with the child, with a duty to account for all sums recoverable as damages.
>
> We should mandate the two conditions into the claim

---

[8] The "emotional benefit" rule is taken from § 920 of the Restatement of Torts 2d, which provides:

> When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.

While courts allowing the recovery of damages for mental pain and suffering, in "wrongful birth" actions, have generally held that such damages should be offset by the emotional benefits derived by the plaintiffs from the child, see *Harbeson v. Parke-Davis*, 656 P2d 483, 494 (15) (Wash. 1983), courts have also generally held that the recovery of the extraordinary expenses of child-care should not be offset by emotional benefits under § 920 of the Restatement since the former and the latter relate to different interests. See *Phillips v. United States*, 575 FSupp. 1309, 1319 (13) (D.S.C. 1983); *Gallagher v. Duke University*, 852 F2d 773, 776-777 (2) (4th Cir. 1988). In *Graves*, this court rejected the application of the "emotional benefit" rule, holding that: "[u]se of the offset provided by the benefit rule appears to be an attempt to apply the theory of consequential damages and consequential benefits to human life and parenthood. We are not willing to impose such a theory in this area of delicate human relations." *Graves*, 252 Ga. at 444 (3).

for wrongful birth. If we have the authority to recognize the claim, we have the authority to determine its character. The trial court's discretion may be relied upon for establishing the mechanics of the reversionary trust-fiduciary relationship concept on an individual case basis. Id.

Simply put, "wrongful birth" does not fit within the parameters of traditional tort law. The concept of such a cause of action is unique:

It is a new and on-going condition. As life, it necessarily interacts with other lives. Indeed, it draws its "injurious" nature from the predilections of the other lives it touches. It is naive to suggest that such a situation falls neatly into conventional tort principles, producing neatly calculable damages.

Note, 13 Val.U.L.Rev. 127, 170 (1978). The problems that have accompanied the judicial recognition of the cause of action in other jurisdictions are legion and after more than a decade of judicial attempts to fit "wrongful birth" into parameters which do not fit the cause of action or which courts are loathe to apply with full vigor because of the harshness of the consequences, it is clear that there are no easy answers to be found. Indeed, with the continued advances in medical science which are occurring daily, the problems presented by the concept of "wrongful birth" actions can only become increasingly more numerous and more complex.[9]

As we have already recognized, this is an area more properly suited to legislative action as the legislature offers a forum wherein all of the issues, policy considerations and long range consequences involved in recognition of the novel concept of a "wrongful birth" cause

---

[9] As stated in *Azzolino*, 337 SE2d at 535 (3), supra:

As medical science advances in its capability to detect genetic imperfections in a fetus, physicians in jurisdictions recognizing claims for wrongful birth will be forced to carry an increasingly heavy burden in determining what information is important to parents when attempting to obtain their informed consent for the fetus to be carried to term. Inevitably this will place increased pressure upon physicians to take the 'safe' course by recommending abortion. This is perhaps best illustrated by a story drawn from a real life situation.

A clinical instructor asks his students to advise an expectant mother on the fate of a fetus whose father has chronic syphilis. Early siblings were born with a collection of defects such as deafness, blindness, and retardation. The usual response of the students is: 'Abort!' The teacher calmly replies: 'Congratulations, you have just aborted Beethoven.'

Trotzig, The Defective Child and the Actions for Wrongful Life and Wrongful Birth, 14 J.Fam.L. 15, 38-39 (1980), quoting, Feinman, *Getting Along with the Genetic Genie*, Legal Aspects of Med. Prac. 38 (March 1979).

of action can be thoroughly and openly debated and ultimately decided.

For the foregoing reasons, we hold that there is no cause of action for "wrongful birth" in Georgia and that the trial court should have granted the defendants' motion for summary judgment for failure of plaintiffs to state a claim. Accordingly, we reverse Division 1 of the Court of Appeals' opinion and thus it is unnecessary to address the remaining issues dealt with by the Court of Appeals.

*Judgment reversed. Clarke, C. J., Bell, Fletcher, JJ., and Judge Hugh D. Sosebee, concur; Smith, P. J., Hunt and Benham, JJ., dissent; Weltner, J., not participating.*

SMITH, Presiding Justice, dissenting.

This cause of action that the majority denominates a "wrongful birth" should not be distinguished from other medical malpractice actions. See the dissent in *Fulton-DeKalb Hosp. Auth. v. Graves*, 252 Ga. 441 (314 SE2d 653) (1984). As the *Graves* majority stated "[s]uch an action is no more than a species of malpractice which allows recovery from a tortfeasor in the presence of an injury caused by intentional or negligent conduct." Id. at 443. The labels being attached here are misleading; there is either medical malpractice as defined by Georgia law or there is not.

The plaintiffs alleged that the doctors "breached the applicable standard of care by failing to provide advice concerning the increased risks of genetic abnormalities associated with higher maternal age, and by failing to have performed an amniocentesis so as to detect whether the unborn child had Down's Syndrome." The plaintiffs further asserted that if the test had been performed, they would have elected to terminate the pregnancy rather than carry the Down's Syndrome child to term.

The majority has, by looking to the law of other jurisdictions, changed Georgia law. Under our law, a medical malpractice action includes a claim for damages resulting from the injury to any person arising out of an improper diagnosis. OCGA § 9-3-70 (1). The plaintiffs' allegation that the doctor failed to perform the test was an assertion that the doctor failed to diagnose the child's impairment in time for the parents to make an informed choice as to whether the mother would elect to terminate the pregnancy.

This case must be analyzed in terms of traditional Georgia tort law. OCGA § 51-1-27 provides:

A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a

tort for which a recovery may be had.

Georgia law controls this case, not the Colorado law cited by the majority. Georgia law provides:

> [T]here are three essential elements [in a medical malpractice claim]: (1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained.

*Hawkins v. Greenberg*, 166 Ga. App. 574, 575 (304 SE2d 922) (1983). Thus the plaintiff must prove: 1) there was a doctor-patient relationship; 2) that the doctor failed to exercise the requisite degree of skill and care, and 3) that the doctor's failure was the proximate cause of the injury sustained. The measure of the requisite skill and care is determined by comparing the skill and care provided with that required of physicians under similar circumstances as ordinarily employed by the profession in general. See Ga. Law of Torts § 5-2 and cases cited therein. I agree with Justice Hunt's dissent in that the injury in this case, just as in *Graves*, is the "birth of the unwanted child." Why are these plaintiffs and others similarly situated barred from asserting a claim when the *Graves'* plaintiffs were not so barred? The injury is the same.

The majority would keep this issue from a jury because the "impairment [was] inherited from her parents and an impairment which was already in existence when the parents first came into contact with the physician." If a patient comes to the doctor with an inflamed appendix, or gall or kidney stones, and the doctor fails to properly diagnose the condition, we do not absolve the doctor of all future damages because the condition was genetic and because it was in existence when the patient walked into the office. That would be absurd. With a proper diagnosis no injury would have occurred. Thus, the correct analysis of this case centers around the contention that because of an improper diagnosis an injury occurred. In light of this, these plaintiffs should not be turned away at the courthouse door but rather should be allowed to attempt to prove their injury just as any other.

If we can look at pregnancy without the emotionalism that arises when termination of pregnancy is discussed, we can see that pregnancy is a medical condition and one which, at this point in the law, a woman has a right to terminate whether her child will be normal or abnormal. Because she has a right to plan her family and terminate her pregnancy she also has the right to be informed of her risk of bearing an impaired child, an opportunity to decline to take an amniocentesis if she is in the category of women who are at risk, and, if she

elects to take the test, she has the right to a proper diagnosis of the results of the test so that she can make an informed choice about her family planning.

The majority opinion bars even women who are in the highest risk category from asserting a claim of improper diagnosis against her physician. The issue is whether in a particular case the physician committed malpractice in failing to diagnose an abnormal fetus in time to allow the woman to elect between completing or terminating the pregnancy. Because this is, of necessity, a fact sensitive issue, it should be presented to and determined by a jury. It is totally unnecessary to foreclose this plaintiff and all future plaintiffs from any opportunity whatsoever to bring the facts before a jury.

Assessing damages is not so very difficult. If a woman was carrying a healthy fetus and because of failure to diagnose a problem at delivery the child was born impaired, we would have no problem assessing damages. More importantly we would not even consider the theory that the joy of parenthood should offset the damages. Would anyone in their right mind suggest that where a healthy fetus is injured during delivery the joy of parenthood should offset the damages? There is no more joy in an abnormal fetus come to full term than a normal fetus permanently injured at delivery. Both are heartbreaking conditions that demand far more psychological and financial resources than those blessed with normal children can imagine.[10]

As for damages, I would follow our holding in *Graves* and in addition I would allow the cost of rearing and upkeep of the child for life, subject to reduction for the child's ability to contribute to its upkeep upon reaching majority. This additional award includes but is not limited to special costs for education and training in connection with the child's impairment. As to the appellees' claim for damages for their own mental pain and suffering I would follow my special concurrence in *Ob-Gyn Assoc. v. Littleton*, 259 Ga. 663 (386 SE2d 146) (1989). "I agree with the 'handful of courts' that allow a cause of action to recover for serious emotional distress without regard to whether plaintiff suffered any physical injury or physical illness." Id. at 670.

---

[10] There are times when normal children are not a joy. But those temporary discomforts pale in comparison to the pain one must suffer when you will never see your child engage in normal activities, when your child is stared at in malls and grocery stores, when your child is picked on and taunted because he or she is different. The pain is different for the child also, who will not know the joy of their first prom, or graduation, or a wedding day. And compounding that pain is the fear in the hearts of the parents who know that when they die, their child will be left in some institution and will never know the joys of intimacy with another person.

HUNT, Justice, dissenting.

I write separately because I disagree with the majority that there is no cause of action for a wrongful birth, and I also disagree with Justice Benham, that such a cause of action should incorporate the extraordinary expenses of rearing a severely impaired child.

I agree with Justice Benham that there is nothing particularly innovative or unusual about wrongful birth other than its nomenclature. That is, this cause of action, just as the cause of action for wrongful pregnancy recognized in *Fulton-DeKalb Hosp. Auth. v. Graves*, 252 Ga. 441 (314 SE2d 653) (1984), can be analyzed in terms of traditional tort law. The elements of a negligence claim are present. The majority acknowledges the existence of a duty to inform, and a breach of that duty in this case, but confuses the remaining two elements of causation and damages. To determine causation, the injury must be identified. Contrary to the analyses of the majority and dissent, the injury caused by the defendants' negligence in this case is, as in *Graves*, the birth of the unwanted child. The injury is not, as Justice Benham argues, the imposition of the *extraordinary* expenses of rearing a severely impaired child. Rather, as in *Graves*, "but for" the defendants' negligence there would have been *no* child at all, not a normal child. And the damages which would ensue from such an injury would logically include the ordinary, as well as extraordinary, expenses of the child's existence. See Judge Beasley's opinion, concurring in part and dissenting in part, in this case below, *Atlanta Obstetrics &c. Group v. Abelson*, 195 Ga. App. 274, 282 (392 SE2d 916) (1990).

In any event, the plaintiffs should be entitled to recover the damages available to the plaintiffs in *Graves*, including expenses for pain and suffering, medical complications, costs of delivery, lost wages, and loss of consortium. *Graves*, supra at 443 (2). As we noted in *Graves*, "[t]hese damages are consistent with the damages which may be recovered in any malpractice case and represent no real deviation from traditional tort remedies." Id. at 443 (2). Because of *Graves*, however, neither ordinary child-rearing expenses, nor extraordinary expenses may be recovered. As stated by Judge Beasley:

> The determination that the law should not reach into a realm which requires the measurement of human life value forecloses a facing of the same dilemma when addressing the costs of raising a congenitally imperfect human being. It requires saying that this child, unwanted during the period before birth if defective but now in life and not a fetus, is worth less than a child unwanted altogether during the same correlative period of gestation. Otherwise, what is the distinction between awarding ordinary costs and extraordinary

costs? What is the basis or ground or reason for the latter when there is no basis or ground or reason acceptable in Georgia law for the former?

195 Ga. App. at 282. Accordingly, I would find a cause of action for wrongful birth, but would limit damages to those recognized in *Graves* as recoverable for wrongful pregnancy.[11]

BENHAM, Justice, dissenting.

The question posed here is whether our 200-year-old legal system is flexible enough to accommodate modern-day medical technology. Unlike the majority, who answers this question in the negative by holding that this state will not recognize a cause of action for wrongful birth, I would answer in the affirmative and hold that such a cause of action exists within the framework of our traditional law of torts.

One of the beauties of American jurisprudence is its ability to accommodate new ideas, new approaches and novel concepts. A brief review of this court's decisions in the past few years leads inexorably to this conclusion. See, e.g., *Caldwell v. State*, 260 Ga. 278 (393 SE2d 436) (1990) (DNA); *State of Ga. v. McAfee*, 259 Ga. 579 (385 SE2d 651) (1989) (disconnecting life support); *Fulton-DeKalb Hosp. Auth. v. Graves*, 252 Ga. 441 (314 SE2d 653) (1984) (wrongful pregnancy). If we are to maintain the proper balance between law and medicine, we cannot allow the law to be determined in the laboratory; but we would be derelict in our duty if we failed to take into consideration developments in the laboratory.

In support of its disinclination to provide a remedy in this case, the majority contends that this is a matter better left to the legislature. While I agree that some matters can be better addressed by the legislature, and that some involvement by the legislature may be necessary with regard to the tort of wrongful birth, I do not agree that the legislative route is the only route available or that it is the appropriate route in this case. This court decided *Fulton-DeKalb Hosp. Auth. v. Graves*, supra, in 1984 and the legislature has yet to act in that arena. This court must be willing to address the legitimate complaints of citizens as was the Court of Appeals. It tackled the issues in this case in an admirable fashion, and we should do no less.

Turning to the majority's analysis of the failure of traditional tort principles to provide a cause of action in this case, I must point out two major conceptual fallacies adopted by the majority. When addressing the "third prong" of that analysis, an injury to the plaintiff, the majority incorrectly holds that "[i]n order to satisfy that prong,

---

[11] Recognition of damages beyond those permitted by *Graves* is a matter of legislative policy, as suggested by the majority, to be considered and resolved by the General Assembly.

we must recognize the life of the child as the injury which has been inflicted upon plaintiffs by the defendants." The injury is not that the plaintiffs have had a child, but that they have had imposed on them the extraordinary expenses of raising a severely impaired child. Unlike the case in wrongful pregnancy, the plaintiffs here expected to have a child. They did not expect to have a child with severe impairments, and but for the alleged negligence of defendants, would not have had the extraordinary expenses of raising an impaired child.

The second fallacy is in addressing the "fourth prong," causation. The majority is correct in asserting that the defendants did not cause the child's impairment. That is one reason why a child in the position of plaintiffs' child cannot bring a suit under this cause of action. However, the plaintiffs here are the parents, and defendants' alleged negligence can be said to be the cause of their injury, which was to have an impaired child rather than an unimpaired child.

We must not be deterred from decision here by the difficulty of framing appropriate remedies. While the question of damages is complex and is fraught with policy considerations, it is not an insurmountable problem. The Court of Appeals, in both the majority and Judge Beasley's dissent, undertook to address these issues. I would advocate a road between those two opinions. While I agree with the majority below that the extraordinary expenses of raising the child are recoverable, I agree with Judge Beasley that those expenses would be recoverable only up to the majority of the child. From that point, the plaintiffs' obligation to the child is moral rather than legal, and we must put some reliance on their good faith and on the social service mechanisms we have in place.

The majority's concern about the misuse of the money intended for the child's support is equally misplaced. We do not deny recovery of child support payments, even sizeable arrearages on the ground that the custodial parent might not be responsible to the child for whose support the money was paid. Again, there are mechanisms in place to provide protection to those who need it.

In reviewing the case law, we find only two states who have taken a stance similar to the majority.[12] As the majority has noted, most of the states who have addressed the issue have found the existence of a cause of action for wrongful birth. Those states who have recognized the cause of action[13] have done so by realizing that in applying traditional tort concepts, there is nothing particularly innovative or un-

---

[12] See *Azzolino v. Dingfelder*, 337 SE2d 528 (N.C. 1985); and *Wilson v. Kuenzi*, 751 SW2d 741 (Mo. 1988).

[13] See, e.g., *Smith v. Cote*, 513 A2d 341 (N.H. 1986); *Karlsons v. Guerinot*, 394 NYS2d 933 (N.Y. App. Div. 1977); *Lininger v. Eisenbaum*, 764 P2d 1202 (Colo. 1988); *Proffitt v. Bartolo*, 412 NW2d 232 (Mich. App. 1987).

usual about this cause of action other than its nomenclature.

The judiciary has historically performed a meaningful role in addressing citizen complaints in a timely and adequate fashion. We must remain willing to answer the age-old questions: If not us, then who; if not now, then when; if not here, then where? With regard to this case, I believe the answer is that the crucial issues should be decided by this court, here and now. What I urge this court to do is not to retreat from the position it took in *Fulton-DeKalb Hosp. Auth. v. Graves*, supra, but to add further clarification to the matter. By doing so, we will provide a disciplined framework for dealing with recurring problems such as this.

DECIDED DECEMBER 5, 1990 —
RECONSIDERATION DENIED DECEMBER 20, 1990.

*Alston & Bird, Judson Graves, Bryan A. Vroon, Holly B. Barnett, Robert P. Constantine, Jr.,* for appellants.

*Don C. Keenan, David S. Bills,* for appellees.

*Jones, Brown & Brennan, Taylor W. Jones, Myles E. Eastwood, Kennedy & Kennedy, Reid W. Kennedy, William Q. Bird, Love & Willingham, Daryll Love, Allen S. Willingham, Robert P Monyak, Thomas W. Malone, Foy R. Devine, Williams & Henry, Philip C. Henry, Middleton & Anderson, Robert H. Benfield, Jr., Elizabeth J. Appley,* amici curiae.