[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11164
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cv-04851-TWT

RENE ZELT,
TRAYCE ZELT,

Plaintiffs - Appellants,

versus

XYTEX CORPORATION,
a Georgia Corporation,
XYTEX CRYO INTERNATIONAL LTD.,
a Georgia Corporation,
MARY HARTLEY,
an individual,
J. TODD SPRADLIN,
an individual,

Defendants - Appellees,

DOES 1 - 25,
inclusive,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(February 4, 2019)

Before TJOFLAT, JILL PRYOR and NEWSOM, Circuit Judges.

PER CURIAM:

Rene and Trayce Zelt sued Xytex Corporation and other defendants connected to Xytex's sperm bank operations for misrepresenting to them the characteristics of the sperm donor they selected to fertilize the eggs that have grown into their two children. The district court granted the defendants' motion to dismiss based on Georgia Supreme Court precedent denying recognition of tort actions for wrongful birth. Although we are deeply troubled by the defendants' alleged conduct in this case, our careful review of the Zelts' claims leads us to conclude that we must affirm the district court's grant of the motion to dismiss.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

We draw the facts directly from the Zelts' complaint and construe them in the light most favorable to the Zelts. *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012). The Zelts have two children who were conceived by

2

artificial insemination with semen the Zelts purchased from Xytex, a for-profit vendor of human semen.

On its website, Xytex promised it would carefully screen men applying to donate sperm using interviews and a physical exam to ensure their suitability to become a donor. Its website also stated that Xytex would conduct physical exams every six months to confirm donors' "continued good health," update online donor profiles, and convey new information learned about donors to clients who used sperm purchased from Xytex so that clients could "make the most informed decision possible when selecting a donor." Doc. 1 ¶¶ 16-17 (internal quotation marks omitted).[1]

When the Zelts contacted Xytex about purchasing sperm, the company pointed them to Donor #9623. Xytex declared on its website and in statements made directly to the Zelts that Donor #9623 had bachelor's and master's degrees and was working on a Ph.D., had an IQ of 160, had a "nearly perfect" medical and mental health history, had no criminal background, and was one of Xytex's most sought-after donors. *Id.* ¶ 30. Xytex further represented that Donor #9623's sperm were rarely available.

Based on Donor #9623's characteristics and Xytex's representations about its screening process and its pledges to update sperm recipients with new

---

[1] Citations in the form "Doc. #" refer to numbered entries on the district court's docket.

information, the Zelts decided to purchase Donor #9623's sperm from Xytex. Twice Rene Zelt was artificially inseminated with Donor #9623's sperm, and she gave birth to two children.  Other prospective parents also purchased Donor #9623's sperm; he is the biological father of 36 children.

As it turns out, Donor # 9263 is James Christian Aggeles, a man with characteristics the Zelts find highly undesirable.  Before the Zelts purchased his sperm, Aggeles had:  been diagnosed with psychotic schizophrenia, narcissistic personality disorder, a drug-induced psychotic disorder, and significant grandiose delusions; been hospitalized repeatedly for mental health reasons; received Social Security Disability Insurance due to a finding that he was disabled; and been arrested for burglary, trespassing, driving under the influence, and disorderly conduct.  He has no master's degree, was never enrolled in a Ph.D. program, and had dropped out of school, only earning a college degree years after the Zelts purchased his sperm and used it to inseminate Rene Zelt.  He also has a felony conviction, having pled guilty to residential burglary.[2]

When Aggeles applied to Xytex to become a sperm donor, he lied on his written questionnaire about his educational achievements and mental health background.  After Aggeles told a Xytex employee that he thought his IQ was

---

[2] It is unclear from the record whether this conviction occurred before or after the Zelts purchased his sperm or before or after Rene Zelt was artificially inseminated.

4

about 130, the employee suggested to him that he had an IQ of 160.  The employee also informed Aggeles that more educated donors were more successful in selling their sperm and encouraged Aggeles to lie on his application about his education. Accordingly, Aggeles falsely represented on the questionnaire that he had bachelor's and master's degrees and was enrolled in a Ph.D. program.  He also failed to disclose that he had been hospitalized twice for mental health reasons and been prescribed anti-psychotic medications.  Shortly after Aggeles applied, Xytex approved him as a sperm donor and assigned him number 9623.

Xytex easily could have determined that none of these representations about Donor #9623 was true.  For example, if Xytex had conducted a simple Internet search using Google, it would have discovered that Aggeles had not completed college, had been diagnosed with schizophrenia, and had been convicted of a felony.  Aggeles's physical exam with Xytex's staff lasted only ten minutes, and the examiner never discussed his physical or mental health history with him. Xytex did nothing to verify the validity of the representations it made to the Zelts regarding Donor #9623.  It never requested Aggeles's medical records or asked him to sign a release so it could obtain his medical records, never asked about his mental health history or spoke to any of his mental health providers, never asked about his criminal history, never requested any proof of his identification, and

5

never attempted to confirm his educational history. Xytex has never contacted the Zelts to provide any additional information about Aggeles.

Years after their children were born, the Zelts learned Donor #9623's identity, conducted an Internet search using Google, and immediately discovered that Xytex's representations about Donor #9623's education, medical and mental health, and criminal background were false. Aggeles's mental illnesses are genetic and hereditary, making it possible or probable that the Zelts' children have or will develop one or more of the same illnesses. The Zelts suffered physical and emotional pain and suffering as a result of learning the truth about their sperm donor. The Zelts also incurred costs to purchase Donor #9623's sperm, have already spent money to evaluate their children for mental illnesses, and expect to have to spend more money in the future to evaluate and treat their children.

The Zelts filed a complaint in federal court alleging thirteen state law claims against Xytex and various affiliated individuals. The defendants moved to dismiss the Zelts' complaint for failure to state claims for which relief could be granted. *See* Fed. R. Civ. P. 12(b)(6). The district court granted the motion on the basis that the claims boil down to a wrongful birth claim, which Georgia law does not recognize. *See Atlanta Obstetrics & Gynecology Grp. v. Abelson*, 398 S.E.2d 557, 560 (Ga. 1990). The Zelts timely appealed.

## II.    STANDARD OF REVIEW

6

We review *de novo* a district court's grant of a defendant's motion to dismiss for failure to state a claim, *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016), and the district court's rulings on questions of state law, *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991).  At the motion to dismiss stage, we accept the well-pleaded allegations in the complaint as true and view them in the light most favorable to the Zelts.  *See Chaparro*, 693 F.3d at 1335.  A complaint must contain enough facts to make a claim for relief "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III.    DISCUSSION

The core of the Zelts' complaint is that they are entitled to money damages for claims sounding in Georgia contract, tort, and statutory law[3] and arising out of Xytex's misrepresentations to them about the characteristics of Donor #9623.  In essence, the Zelts claim that Xytex perpetrated a fraud by making representations about Donor #9623 that Xytex knew would induce the Zelts to purchase his sperm.  Had they known the truth about Donor #9623's background, the Zelts would have

---

[3] Because the parties agree that Georgia law applies to all claims in this case, and the Zelts do not argue that the application of Georgia law would be manifestly unjust, we need not engage in any choice-of-law analysis.  Instead, we assume that Georgia law applies. *See Smith v. N.Y. Life Ins. Co.*, 579 F.2d 1267, 1270 n.5 (5th Cir. 1978) (holding that, where the parties relied in the district court on the application of Georgia law even though Utah law should have governed the case, the parties were bound on appeal by Georgia law, "absent some manifest injustice").  Decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981 are binding on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

acquired sperm from a different donor, one who had characteristics they found desirable. As a result of purchasing Donor #9623's sperm from Xytex and using it to fertilize the eggs that became their two children, the Zelts contend, they have been harmed by Xytex's fraud. But the Zelts face an insurmountable hurdle: under the authority of Georgia's highest appellate court, they have suffered no legally cognizable injury. As we elaborate below, we must affirm the dismissal of all of the Zelts' claims that necessarily entail pleading an injury equal to the difference in the value of a child's life with Aggeles as the sperm donor and the value of a child's life with a different donor.

The Zelts' case rises and falls on whether their claims are actually for wrongful conception (which Georgia law recognizes) or wrongful birth (which Georgia law does not recognize). The Zelts attempt to distinguish their claims from wrongful birth claims, but we conclude that their claims pose the same concerns that the Georgia Supreme Court voiced regarding wrongful birth claims, and so the Zelts' claims fail as a matter of law.

A claim for wrongful conception, also known as wrongful pregnancy, alleges that, had the medical provider properly performed a sterilization or abortion procedure, the plaintiff would not have become pregnant. *See Fulton-DeKalb Hosp. Auth. v. Graves*, 314 S.E.2d 653, 654 (Ga. 1984). The damages recoverable include "expenses for the unsuccessful medical procedure [that] led to conception

8

or pregnancy, . . . pain and suffering, medical complications, costs of delivery, lost wages, and loss of consortium." *Id.* Costs of child-rearing are excluded, however, due to courts' discomfort with the notion that a parent could be "said to have suffered an injury in the birth of a child." *Id.* at 655-56.

In contrast, a claim for wrongful birth alleges that a medical provider failed to provide advice, information, or treatment that, had it been provided, would have led the parents to terminate the pregnancy. *See Abelson*, 398 S.E.2d at 559-60. The Georgia Supreme Court has held that wrongful birth claims are not actionable under Georgia law. *Id.* at 560. In *Abelson*, the court noted two main concerns. One was that the medical provider's actions did not cause the impairment to the child that the parents found objectionable; rather, the cause of the impairment was the child's genetic composition as determined at conception. *Id.* at 560-61. The other concern echoed the reason why the court refused to allow the costs of child-rearing as damages in wrongful conception actions: the court was unwilling to declare that "life, even life with severe impairments, may ever amount to a legal injury." *Id.* at 561 (internal quotation marks omitted and alternation adopted).

*Graves* and *Abelson* establish the following guideposts. In a wrongful conception action, the plaintiff never wanted to become pregnant in the first place. The harm the plaintiff alleges is the pregnancy itself, so pregnancy-related damages are allowed, but not damages related to child-rearing, which is not a

legally cognizable injury.  In a wrongful birth action, by contrast, the plaintiff wanted to become pregnant but did not want to give birth to an impaired child. The harm the plaintiff alleges is the birth of the impaired child, and Georgia courts will not compare the value of an impaired child's life to the child's nonexistence. The Zelts try to cast their claims as closer to wrongful pregnancy claims; Xytex tries to cast their claims as closer to wrongful birth claims.

The Zelts' complaint leaves ambiguous what exactly they are alleging as the harm they suffered.  For example, their first cause of action states that, had they known the true facts, the Zelts "would not have purchased the sperm of Donor #9623 from Defendants, and Plaintiffs have been harmed as a result of Defendants' deceit and fraud."  Doc. 1 ¶ 44.  Many of their other claims refer only to the Zelts' "harm," "injuries," or "losses."  *See, e.g.*, *id.* ¶¶ 48, 55, 58, 60, 65.  On appeal, they argue, "But for [Xytex's] reckless and negligent conduct, the Zelts would have conceived children with a healthy biological father."  Reply Br. at 10.  Put differently, their argument is that their children may have inherited undesirable qualities from Aggeles that they would not have inherited from another sperm donor.[4]

---

[4] Drawing all inferences from the facts alleged in the complaint in the Zelts' favor, we assume that the use of Aggeles's sperm is or will be the cause of any undesirable characteristics, such as mental illness, their children may currently have or will develop in the future.

Facing the problem of fitting a square peg into a round hole, the district court labeled the Zelts' complaint a barred wrongful birth action. We agree with the Zelts, however, that they did not ask the court to compare their two children's possibly impaired existence to their nonexistence, which is the essence of a wrongful birth action. Rather, the relevant counterfactual is the children's existence had their parents used sperm donated by someone other than Aggeles. The difference between the children's lives with Aggeles as the donor versus their lives with a healthy donor is the impairments the children might have or develop as a result of inheriting Aggeles' genetic make-up.

Assigning a numeric value to a person's existence with impairments, which the Georgia Supreme Court in *Abelson* would not countenance, is not the same as assigning a numeric value to the impairments only, on which the Georgia Supreme Court has not opined. But these tasks are similar enough that we read *Abelson*'s reasoning as foreclosing us from undertaking the latter. Inherent in asking this Court to compensate the Zelts for Xytex's failure to ensure that their children would be conceived using a healthy sperm donor is the notion that they would have preferred children without the impairments the children might have or develop because Aggeles is their biological father. We are sympathetic to the Zelts' pain and fear over what they and their children stand to suffer. But we would be extending Georgia law beyond what state law authorizes were we to recognize that

11

the Zelts have suffered a legally compensable injury because their children may be different from what the Zelts envisioned when, as a result of Xytex's alleged deceit, they purchased Donor #9623's sperm and underwent artificial insemination.

The Zelts argue that awarding damages for costs arising out of their pregnancies—the cost of prenatal care, lost wages during pregnancy and childbirth, and pain and suffering during pregnancy and childbirth—would require no calculation of the value of the children's possible impairments. This is true, but it is logically inconsistent for the Zelts to argue that the relevant counterfactual is giving birth to healthy, non-impaired children (to avoid having their claims dismissed under *Abelson*) *and* to argue simultaneously that the relevant counterfactual is non-conception (to enable their claims to proceed under *Graves*). To the extent the Zelts are alleging, in the alternative, a wrongful conception claim (which would entitle them to pregnancy-related expenditures and losses under *Graves*), this claim is not "plausible," *Twombly*, 550 U.S. at 570, because the Zelts clearly wanted to become pregnant and to give birth.[5]

---

[5] The Zelts also attempt to distinguish *Abelson* and other Georgia cases because those cases involved "(1) an incurable genetic disease that was created at the time of conception and (2) a negligent failure to diagnose that occurred post-conception." Reply Br. at 4. The Zelts' argument speaks only to the *Abelson* court's concern about causation—that it was improper to blame the child's impairment on the doctor's failure to diagnose because the proximate cause of the child's impairment was the genetic disease created at the time of conception. The Zelts attempt to negate the causation problem by arguing that, if they had known the truth about Donor #9623 before insemination (and conception), they would have selected a different donor—so the cause of their children's impairment becomes Xytex's misrepresentations. This argument fails to address their injury, which we have already declined to recognize as a compensable legal injury.

In sum, our reading of *Abelson* forecloses us from recognizing as a legal injury the Zelts' children's inheritance from Aggeles of characteristics the Zelts find objectionable and that their children allegedly would not have inherited from a different sperm donor.  Monetizing the detrimental value of these characteristics is a task "more properly suited to legislative action[,] as the legislature offers a forum wherein all of the issues, policy considerations and long range consequences involved . . . can be thoroughly and openly debated and ultimately decided." *Abelson*, 398 S.E.2d at 563.  We affirm the dismissal of all of the Zelts' claims that allege as the injury their children's inheritance from Aggeles of objectionable characteristics that the children would not have inherited from a different donor.[6] These include the Zelts' claims for fraud, negligent misrepresentation, products liability (including strict liability and negligence), breaches of express and implied warranties, negligence, unfair business practices,[7] and false advertising, as well as the part of their claim for promissory estoppel that requests money damages.

---

[6] Part of the Zelts' request for damages is to cover the cost of care for their children for conditions that may be attributable to Aggeles.  Even if the Zelts proved a causal connection between Aggeles's genes and their children's present or future mental or physical conditions, *Abelson* bars any award of extraordinary costs.  *Abelson*, 398 S.E.2d at 561 (explaining that awarding extraordinary costs of child-rearing but disallowing ordinary costs of child-rearing would "require[] a contortion of the traditional rule of recoverable damages that defies all logic and explanation").

[7] As to the Zelts' claim for injunctive relief under the Georgia Fair Business Practices Act, they still must establish injury to prevail.  *See* O.C.G.A. § 10-1-399(a) ("Any person who suffers *injury* or *damages* . . . as a result of consumer acts or practices . . . may bring an action individually . . . to seek equitable injunctive relief[.]" (emphasis added)); *Zeeman v. Black*, 273 S.E.2d 910, 916 (Ga. Ct. App. 1980).  This claim therefore fails for the same reasons.

Although these claims do not exactly fit the mold of a wrongful birth claim, they suffer from the same fatal flaw:  requiring this Court to recognize as an injury the possibility that their children were born with what the Zelts deem to be undesirable characteristics.

For the same reason, we also affirm the dismissal of the Zelts' claim for unjust enrichment and their attendant demand for disgorgement of "the payments received from Plaintiffs."  Doc. 8 at 33.  Although the amount by which Xytex was enriched is easy to calculate, calling this enrichment "unjust" necessarily implies that the Zelts' children somehow are worth less than they would have been worth had they been conceived using a different donor's sperm.  *See, e.g.*, *Engram v. Engram*, 463 S.E.2d 12, 15 (Ga. 1995) (measuring unjust enrichment by the "enhance[ment] [in] the value" the defendant received).  *Abelson* precludes us from recognizing this claim as well.[8]

## IV.   CONCLUSION

---

[8] The Zelts have abandoned on appeal their remaining claims for battery and specific performance and the part of their claim for promissory estoppel that requests injunctive relief. The scant mention of these claims and requested remedies in their opening brief, coupled with the absence of any citations to case law, are insufficient to preserve these claims on appeal.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682 (11th Cir. 2014) (holding that abandonment occurs when only "passing references appear in the argument section of an opening brief, particularly when the references . . . are buried within those arguments" and the brief "cites no authorities" (internal quotation marks omitted)).  We thus affirm the dismissal of these claims.  *See Bonanni Ship Supply, Inc. v. United States*, 959 F.2d 1558, 1561 (11th Cir. 1992) ("[T]his court may affirm the district court where the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court.").

Reckless, reprehensible, and repugnant, Xytex and its employees' alleged conduct undoubtedly caused severe emotional harm to the Zelts and other families who purchased Donor #9623's sperm.  But we must look to and faithfully apply Georgia law.  The Georgia state courts or the State's legislature may decide to recognize wrongful birth claims or claims like the Zelts' claims for the wrongful and fraudulent sale of sperm.  Until the State has done so, however, we cannot recognize as a private legal injury the birth of a child with actual or potential undesirable inherited characteristics.

For the foregoing reasons, we **AFFIRM** the district court's grant of the defendants' motion to dismiss.

**AFFIRMED.**

15