S09A1543. SMITH et al. v. BAPTISTE et al.
(694 SE2d 83)

CARLEY, Presiding Justice.

Salon Baptiste and Cheryl Baptiste (Appellees) filed a complaint for damages against Chuck Smith and WQXI 790 AM (Appellants), based on allegedly defamatory statements made by Smith and broadcast by WQXI. Pursuant to OCGA § 9-11-68 (a), Appellants offered to settle the case for $5,000. Appellees did not respond to the offer, which was deemed a rejection under OCGA § 9-11-68 (c). The trial court subsequently granted Appellants' motion for summary judgment as to all counts of the complaint. Appellants moved for attorney's fees pursuant to OCGA § 9-11-68 (b) (1). After a hearing, the trial court denied the motion for attorney's fees on the ground that OCGA § 9-11-68 violates the Georgia Constitution. This appeal followed.

1. OCGA § 9-11-68 was enacted as part of the Tort Reform Act of 2005. *Fowler Properties v. Dowland*, 282 Ga. 76, 77 (1) (646 SE2d 197) (2007). It provides that either party may serve upon the other party a written demand or offer to settle a tort claim for a specified amount of money. OCGA § 9-11-68 (a). Moreover, if either party's settlement demand or offer is rejected, that party may be entitled to recover attorney's fees pursuant to OCGA § 9-11-68 (b), which provides:

> (1) If a defendant makes an offer of settlement which is rejected by the plaintiff, the defendant shall be entitled to recover reasonable attorney's fees and expenses of litigation incurred by the defendant or on the defendant's behalf from the date of the rejection of the offer of settlement through the entry of judgment if the final judgment is one of no liability or the final judgment obtained by the plaintiff is less than 75 percent of such offer of settlement.
>
> (2) If a plaintiff makes an offer of settlement which is rejected by the defendant and the plaintiff recovers a final judgment in an amount greater than 125 percent of such offer of settlement, the plaintiff shall be entitled to recover reasonable attorney's fees and expenses of litigation incurred by the plaintiff or on the plaintiff's behalf from the date of the rejection of the offer of settlement through the entry of judgment.

This Court has previously concluded that OCGA § 9-11-68 (b) (1) is unconstitutional as a retrospective law, but has found it unnecessary to pass on other attacks upon the constitutionality of that code section. *Mikesell v. RP Motorsports*, 283 Ga. 476, 477 (660 SE2d 534) (2008); *Fowler Properties v. Dowland*, supra at 79 (2).

In this case, the trial court ruled that OCGA § 9-11-68 impedes access to the courts and thus violates Art. I, Sec. I, Par. XII of the Georgia Constitution of 1983, by depriving tort litigants of the right to pursue their causes of action. Art. I, Sec. I, Par. XII provides that "[n]o person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state." Contrary to the finding of the trial court, this Court has held that Art. I, Sec. I, Par. XII was never intended to provide a right of access to the courts, but was intended to provide only a right of choice between self-representation and representation by counsel. *Couch v. Parker*, 280 Ga. 580, 581 (1) (630 SE2d 364) (2006); *State of Ga. v. Moseley*, 263 Ga. 680, 682 (3) (436 SE2d 632) (1993); *Nelms v. Georgian Manor Condo. Assn.*, 253 Ga. 410, 412-413 (2), (3) (321 SE2d 330) (1984). "Thus, there is no express constitu-

tional 'right of access to the courts' under the Georgia Constitution. [Cits.]" *Couch v. Parker*, supra.

The dissent seeks to avoid this well-settled principle of Georgia constitutional law by ignoring the seminal case of *Nelms v. Georgian Manor Condo. Assn.*, supra, and the doctrine of stare decisis. However,

> "[w]e recognize that no judicial system could do society's work if it eyed each issue afresh in every case that raised it. (Cit.) Indeed, the very concept of the rule of law underlying our own Constitution requires such continuity over time that a respect for precedent is, by definition, indispensable. (Cit.)" [Cit.] . . . Stare decisis is compelling support for adherence to the holding in [*Nelms*], despite [the] objections to its rationale. "The application of the doctrine of stare decisis is essential to the performance of a well-ordered system of jurisprudence. In most instances, it is of more practical utility to have the law settled and to let it remain so, than to open it up to new constructions, as the personnel of the court may change, even though grave doubt may arise as to the correctness of the interpretation originally given to it. (Cits.)" [Cit.]

*Etkind v. Suarez*, 271 Ga. 352, 356-357 (5) (519 SE2d 210) (1999).

*Nelms* has been consistently followed for over a quarter-century, including its application by the author of the dissent in the case of *Love v. Whirlpool Corp.*, 264 Ga. 701, 706 (3) (449 SE2d 602) (1994). Although

> stare decisis should not be applied to the extent that an error in the law is perpetuated[,] . . . [*Nelms*] is not an erroneous statement of the law of Georgia, but merely a pronouncement by a [unanimous] Court as to the proper construction of the [constitutional] law of this state on a matter of first impression.

*Etkind v. Suarez*, supra at 357 (5).

The dissent mistakenly claims that the majority is following the holding in *Bloomfield v. Liggett & Myers*, 230 Ga. 484 (198 SE2d 144) (1973). We have not even cited that case, and instead, as explained above, are following the longstanding rule of law established by *Nelms* and its progeny. Regardless, it is true that in *Bloomfield v. Liggett & Myers*, supra, this Court quoted a statement from the Constitutional Convention of 1877 which clearly shows that the reason for the adoption of the original version of the provision now

in issue was to ensure a person's right of self-representation, and in *Nelms*, this Court cited *Bloomfield* and recited the same quote from the Convention, which was reported by Samuel W. Small in *"A Stenographic Report of the Proceedings of the Constitutional Convention Held in Atlanta, Georgia, 1877* (Constitution Publishing Company, Atlanta, 1877)." *Nelms v. Georgian Manor Condo. Assn.*, supra at 412 (2). The dissent argues that this Court's reliance on that stenographic report is improper because Small was not a member or secretary of the Constitutional Convention of 1877. Rather, the dissent posits, the sole official record is found in the *Journal of the Constitutional Convention of the People of Georgia, Held in the City of Atlanta in the Months of July and August, 1877* (Jas. P. Harrison & Co., State Printers and Publishers, 1877).

That journal is indeed an official record of the various motions, votes and resolutions from the Convention. However, it is not a verbatim report of the full remarks and discussions from the Convention. Instead, that part of the record is found in the *Stenographic Report of the Proceedings of the Constitutional Convention*, which, as its cover page clarifies, transcribes the "debates in full on all questions before the Convention." In fact, the *Journal of the Constitutional Convention* includes the following resolution recognizing Small as the exclusive stenographic reporter of the Convention:

> Resolved, That the thanks of this Convention are due, and are hereby tendered, to Samuel W. Small, Esq., stenographic reporter, for the very able, faithful and impartial manner in which he has reported the proceedings of this Convention; . . . which resolution was agreed to.

*Journal of the Constitutional Convention*, supra at p. 566. Notwithstanding the dissent's misguided attempt to diminish the *Stenographic Report of the Proceedings of the Constitutional Convention* as a "journalist's account[,]" (Dissent, p. 44) that report is in fact a legitimate and reliable record of the Constitutional Convention of 1877. Indeed, for over a century, this Court has repeatedly, and correctly, recognized that stenographic report as a valid record of that Convention. *Parrish v. Employees' Retirement System of Ga.*, 260 Ga. 613, 614 (2) (398 SE2d 353) (1990); *Barber v. Barber*, 257 Ga. 488, 490, fn. 1 (360 SE2d 574) (1987) (dissent); *Ga. Power Co. v. Allied Chemical Corp.*, 233 Ga. 558, 566 (2) (212 SE2d 628) (1975); *State v. Collett*, 232 Ga. 668, 669, fn. 1 (208 SE2d 472) (1974); *Leggett v. Macon Baptist Assn.*, 232 Ga. 27, 30 (II) (205 SE2d 197) (1974); *Speer v. Martin*, 163 Ga. 535, 541 (136 SE 425) (1926) (dissent); *Wright v. Hardwick*, 152 Ga. 302, 309 (1) (109 SE 903) (1921);

*Renfroe v. City of Atlanta*, 140 Ga. 81, 85 (78 SE 449) (1913); *Strickland v. State*, 137 Ga. 1, 18 (72 SE 260) (1911) (dissent); *Clark v. Hammond*, 134 Ga. 792, 795 (1) (68 SE 600) (1910); *Southern Railway Co. v. Melton*, 133 Ga. 277, 285 (1) (65 SE 665) (1909); *Epping v. City of Columbus*, 117 Ga. 263, 271 (43 SE 803) (1903), overruled on other grounds, *Harrell v. Town of Whigham*, 141 Ga. 322, 326 (80 SE 1010) (1913); *Park v. Candler*, 113 Ga. 647, 656 (1) (39 SE 89) (1901); *Blocker v. Boswell*, 109 Ga. 230, 233 (34 SE 289) (1899). Furthermore, this Court is not alone, as the stenographic report has also been relied upon and cited with approval as a credible record of the 1877 Convention in various other legal authorities. Op. Atty. Gen. 89-16; John Dinan, *The Meaning of State Constitutional Education Clauses: Evidence from the Constitutional Convention Debates*, 70 Alb. L. Rev. 927, fn. 32 (2007); Marsha L. Baum & Christian G. Fritz, *American Constitution-Making: The Neglected State Constitutional Sources*, 27 Hastings Const. L.Q. 199, fn. 91 (2000); Emily Field Van Tassel, *Freedom: Personal Liberty and Private Law: "Only the Law Would Rule Between Us": Antimiscegenation, the Moral Economy of Dependency, and the Debate Over Rights After the Civil War*, 70 Chi.-Kent L. Rev. 873, fn. 143 (1995); Dorothy T. Beasley, *The Georgia Bill of Rights: Dead or Alive?*, 34 Emory L.J. 341, 386, fn. 175 (1985); Walter McElreath, *A Treatise on the Constitution of Georgia* (The Harrison Company, 1912) (citing Small's Report approximately 100 times). Indeed, prior to the dissent in this case, no legal authority has ever questioned the clear authenticity, accuracy and validity of the stenographic report, which provides the sole verbatim record of the Convention debates. Thus, contrary to the position of the dissent, this Court's reference to the stenographic report in *Nelms* and *Bloomfield* was appropriate.

Moreover, the history of the current version of the constitutional provision at issue in this case "indicate[s] that the sole purpose underlying the revision and adoption of Art. I, Sec. I, Par. XII was to define and protect the right of an individual to represent himself in the courts of this state." *Nelms v. Georgian Manor Condo. Assn.*, supra at 413 (3). The dissent also ignores the critical factor that *Nelms* compared the Georgia constitutional provision to the access to courts provisions of other states, which, unlike the Georgia provision, expressly "provide that all courts shall be open to every person for the redress of an injury done him[.] [Cits.]" *Nelms v. Georgian Manor Condo. Assn.*, supra at 411 (1). Thus, as *Nelms* correctly concluded, "Art. I, Sec. I, Par. XII is a 'right of choice' (between self-representation and representation by counsel) provision, and not an 'access to the courts' provision such as found in the constitutions of [other states]." *Nelms v. Georgian Manor Condo Assn.*, supra at 413 (3).

Accordingly, the trial court clearly erred in finding a "right of access" violation of Art. I, Sec. I, Par. XII. See *Santana v. Ga. Power Co.*, 269 Ga. 127, 129 (4) (498 SE2d 521) (1998); *Nelms v. Georgian Manor Condo. Assn.*, supra at 412-413 (2), (3). Moreover, OCGA § 9-11-68 (b) (1) does not deny litigants access to the courts, but simply sets forth certain circumstances under which attorney's fees may be recoverable. See *Eubanks v. Ferrier*, 245 Ga. 763, 766 (4) (267 SE2d 230) (1980) (statute did not deprive plaintiff of access to courts, but merely withheld from plaintiff certain types of evidence). "Therefore, even if a constitutional 'right of access to the courts' provision did exist, it would not be applicable here." *Couch v. Parker*, supra at 582 (1).

The trial court also found that OCGA § 9-11-68 violates Art. I, Sec. I, Par. XII because it permits the recovery of attorney's fees absent the prerequisite showings of either OCGA § 9-15-14 or § 13-6-11. However, there is nothing in Art. I, Sec. I, Par. XII, or any other provision of the Georgia Constitution, which mandates that attorney's fees can only be awarded pursuant to those two code sections. Rather, in Georgia, "[a]ttorney's fees are recoverable . . . where authorized by some statutory provision or by contract. [Cits.]" *Ga. Subsequent Injury Trust Fund v. Muscogee Iron Works*, 265 Ga. 790-791 (462 SE2d 367) (1995). See also *Glynn County Fed. Employees Credit Union v. Peagler*, 256 Ga. 342, 344 (3) (348 SE2d 628) (1986). OCGA § 9-11-68 is such a statutory provision authorizing the recovery of attorney's fees under specific circumstances. Because there is no constitutional requirement that attorney's fees be awarded only pursuant to OCGA § 9-15-14 or § 13-6-11, the trial court's finding to the contrary was erroneous.

2. The trial court further ruled that OCGA § 9-11-68 is a special law that violates the uniformity clause of the Georgia Constitution, because it applies only to tort claims, not all civil cases. This State's uniformity clause provides that "[l]aws of a general nature shall have uniform operation throughout this state and no local or special law shall be enacted in any case for which provision has been made by an existing general law. . . ." Ga. Const. of 1983, Art. III, Sec. VI, Par. IV (a). Contrary to the ruling of the trial court, OCGA § 9-11-68 is not a special law affecting only a limited activity in a specific industry during a limited time frame. Compare *Celotex Corp. v. St. Joseph Hosp.*, 259 Ga. 108, 110 (376 SE2d 880) (1989) (special law affected certain asbestos claims); *Lasseter v. Ga. Public Service Comm.*, 253 Ga. 227, 229 (2) (319 SE2d 824) (1984) (special law applied to only one power plant converting from petroleum to coal). Rather, it "operates uniformly throughout the state upon the subject or class of subjects with which it proposes to deal. [Cits.]" *Lasseter v. Ga. Public Service Comm.*, supra.

" 'Our State Constitution only requires a law to have uniform operation; and that means that it shall apply to all persons, matters, or things which it is intended to affect. If it operates alike on all who come within the scope of its provisions, constitutional uniformity is secured. Uniformity does not mean universality. This constitutional provision is complied with when the law operates uniformly upon all persons who are brought within the relations and circumstances provided by it.' (Cits.) A law which operates uniformly upon all persons of a designated class is a general law within the meaning of the Constitution, provided that the classification thus made is not arbitrary or unreasonable." [Cit.]

*State v. Martin*, 266 Ga. 244, 246 (4) (466 SE2d 216) (1996).

Because OCGA § 9-11-68 applies uniformly throughout the State to all tort cases, it is a general law. The clear purpose of this general law is to encourage litigants in tort cases to make and accept good faith settlement proposals in order to avoid unnecessary litigation. See OCGA § 9-11-68 (b) (1), (2), (d) (2) (party rejecting a settlement offer may be liable for attorney's fees, but court may determine that an offer was not made in good faith and disallow an award of attorney's fees). This is certainly a legitimate legislative purpose, consistent with this State's "strong public policy of encouraging negotiations and settlements, [cit.]." *Edelkind v. Boudreaux*, 271 Ga. 314, 317 (2) (519 SE2d 442) (1999). Moreover, the fact that the statute applies to tort cases, but not other civil actions, does not render it an impermissible special law. "The General Assembly may exclude certain persons or things from the application of a general law. [Cit.]" *Matthews v. Macon Water Auth.*, 273 Ga. 436, 437 (542 SE2d 106) (2001). As long as such a law operates uniformly throughout the State, it "is still a general law. [Cit.]" *McAllister v. American Nat. Red Cross*, 240 Ga. 246, 248 (2) (240 SE2d 247) (1977). Accordingly, OCGA § 9-11-68 does not violate the uniformity clause of the Georgia Constitution.

Because the trial court based its order denying the motion for attorney's fees on erroneous findings that OCGA § 9-11-68 is unconstitutional, that order must be reversed.

3. Appellees have argued for the first time on appeal that the current version of OCGA § 9-11-68 became effective after this lawsuit was filed, and that retroactive application of it to this case is unconstitutional. However, this Court will not consider a claim that retroactive application of a statute is unconstitutional when that issue was not distinctly ruled upon by the trial court. *Madison v. State*, 281 Ga. 640, 641 (2) (a) (641 SE2d 789) (2007). See also

*Hindman v. State*, 234 Ga. App. 758, 765 (5) (507 SE2d 862) (1998) (this Court transferred case to Court of Appeals because retroactivity claim and other constitutional challenges were not ruled upon by the trial court, and thus were not preserved for appeal). Because Appellees did not raise this constitutional issue in the trial court and obtain a distinct ruling on it from that court, the issue cannot be considered for the first time in this Court. See *Kromer v. Bechtel*, 289 Ga. App. 306 (1) (656 SE2d 910) (2008) (unconstitutional retroactivity claim regarding OCGA § 9-11-68 "cannot be considered when asserted for the first time on appeal").

*Judgment reversed. All the Justices concur, except Nahmias, J., who concurs specially and Hunstein, C. J., and Benham J., who dissent.*

NAHMIAS, Justice, concurring specially.

I join Divisions 2 and 3 of the majority opinion and Division 1 except for its discussion of stare decisis on page 25. I believe that there is little need to rely on stare decisis to decide this case. Our precedents holding that the constitutional "right to the courts" provision, Ga. Const. of 1983, Art. I, Sec. I, Par. XII, does not create an express and unfettered "right of *access* to the courts," including *Nelms v. Georgian Manor Condominium Assn.*, 253 Ga. 410 (321 SE2d 330) (1984), were correctly decided, for the reasons discussed by the majority and elaborated on below. Were those cases wrongly decided, however, I believe we would need to more carefully consider stare decisis as it applies in this case's context of *constitutional* interpretation.

1. The doctrine of stare decisis is always important, but it is less compelling when, as in this case, the issue is the meaning of a constitutional provision. That is because it is much harder for the democratic process to correct or alter our interpretation of the Constitution than our interpretation of a statute or regulation. The case exclusively relied upon by the majority, *Etkind v. Suarez*, 271 Ga. 352 (519 SE2d 210) (1999), was a *statutory* interpretation case. Indeed, just after the passage that the majority quotes at length, see Majority Op. at 25, the *Etkind* Court *emphasized* the statutory context of the stare decisis analysis at issue there:

> "[E]ven those who regard 'stare decisis' with something less than enthusiasm recognize that the principle has even greater weight where the precedent relates to interpretation of a statute." [Cit.] A reinterpretation of a statute after the General Assembly's implicit acceptance of the original interpretation would constitute a judicial usurpation of the legislative function. *Abernathy v. City of Albany*,

[269 Ga. 88, 90 (495 SE2d 13) (1998)]. Because it constitutes controlling authority on the interpretation of the statutory law of this state, [*Atlanta Obstetrics & Gynecology Group v. Abelson*, 260 Ga. 711 (398 SE2d 557) (1990)] is "binding upon us and will be followed in the present case unless the law upon which [it is] based has been subsequently changed *by legislative action* so as to require a different ruling at the present time." (Emphasis supplied.) *Brinkley v. Dixie Constr. Co.*, 205 Ga. 415, 416 (54 SE2d 267) (1949). Notwithstanding the public policy arguments which support a broader application of our malpractice statute, it appears that the General Assembly has not found those arguments to be persuasive, since it has not amended that statute so as to provide for a wrongful birth cause of action. *Abernathy v. City of Albany*, supra at 90.

*Etkind*, 271 Ga. at 358.

The statutory context of *Etkind* also requires the majority, in its second quotation from that case, to replace the original "construction of the *tort law* of this state," id. at 357 (emphasis supplied), with "construction of the [constitutional] law of this state," Majority Op. at 25. Those are not the same thing, and it is perilous, in our democratic system, to treat them as though they are the same. Unlike the medical malpractice statute at issue in *Etkind*, if we interpreted the "right to the courts" constitutional provision incorrectly in *Nelms* (or our other prior cases), the people's representatives in the General Assembly would be powerless to correct that error, and the people would have to overcome the significant delays and barriers applicable to constitutional amendments to do so. See generally Ga. Const. of 1983, Art. X, Sec. I.

Thus, as the Chief Justice of the United States recently explained:

"Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." . . .

At the same time, stare decisis is neither an "inexorable command," . . . , nor "a mechanical formula of adherence to the latest decision," . . . especially in constitutional cases. . . . If it were, segregation would be legal, minimum wage laws would be unconstitutional, and the Government could wiretap ordinary criminal suspects without first obtaining warrants. . . . Stare decisis is instead a "principle of

policy." . . . When considering whether to reexamine a prior erroneous holding, we must balance the importance of having constitutional questions *decided* against the importance of having them *decided right*.

*Citizens United v. Federal Election Commn.*, ___ U. S. ___, ___ (130 SC 876, 175 LE2d 753) (2010) (Roberts, C. J., concurring) (citations omitted; emphasis in original).

For these reasons, stare decisis in the constitutional context requires more careful consideration of factors such as the age of the precedent, the reliance interests at stake, the workability of the decision, and, most importantly, the soundness of its reasoning. See *Montejo v. Louisiana*, ___ U. S. ___, ___ (129 SC 2079, 2088-2089, 173 LE2d 955) (2009). If the majority in this case is to rely heavily on stare decisis, it should focus on such careful analysis rather than simply quoting exhortations about the importance of stare decisis in interpreting statutes. In my view, we need not rely heavily on stare decisis in this case, because our leading precedents on this issue were "decided right."

2. I find interesting, but largely irrelevant, the extensive debate between the majority and the dissent regarding whether Samuel M. Small's stenographic report on the 1877 constitutional convention is an "official" record of the convention. If I had to decide the issue, I would say that Mr. Small's report is not the "official" record, but that it is a reliable record of the proceedings — and that is the more important point for the task at hand.

Our task in interpreting the Constitution is to determine the meaning of the language used in that document to the people who adopted it as the controlling law for our State. Where the meaning of the provision at issue is unclear, it is useful to look to contemporaneous sources of various kinds to understand it, as well as the problems that the provision was meant to address. The official records of our constitutional conventions are certainly one such source, but they are not the exclusive documents to which we may refer. We may look to contemporaneous dictionaries, legal treatises, and cases, as well as histories of the period.

That is why, for example, in interpreting the meaning of the United States Constitution, it is customary to look to such sources as James Madison's notes of the Constitutional Convention of 1787 (which are "unofficial," as the dissenting opinion would say), the Federalist Papers (including those written by John Jay, who was not a delegate), and the writings of such people as Thomas Jefferson (who was in France during the convention). See, e.g., *Banco Nacional de Cuba v. Sabbatino*, 376 U. S. 398 (84 SC 923, 11 LE2d 804)

(1964).[1] See also *District of Columbia v. Heller*, 554 U. S. 570, 600 (128 SC 2783, 2799, 2802 n. 17, 2803, 171 LE2d 637) (2008) (discussing the Federalist Papers and Jefferson's writings in interpreting the Second Amendment); id. at 654 (128 SC at 2832, n. 17, 2835) (Stevens, J., dissenting) (same). None of these sources are an "official" record of the Framing, but all of them (and many others) are useful because they demonstrate what intelligent and informed people at the time understood the language of the Constitution to mean and what evils it was meant to protect against. Thus, I believe it is simply wrong to assert, see Dissenting Op. at 44, that courts may consider only "official accounts" in seeking to interpret the meaning of constitutional or statutory text.

As ratified in 1877, the "right to the courts" provision read as follows: "No person shall be deprived of the right to prosecute or defend his own cause in any of the Courts of this State, in person, by attorney, or both." Ga. Const. of 1877, Art. I, Sec. I, Par. IV. That language remained unchanged in the 1945 and 1976 Constitutions. See *Nelms*, 253 Ga. at 412. The short discussions regarding this provision during the debates leading to our current Constitution focused on the deletion of the final phrase "or both," in order to clarify that a litigant is not entitled to be represented by himself and by counsel at the same time. See id. at 412-413. It is indeed clear that the 1983 Constitution did not alter the original purpose of the provision. So what was that purpose?

Although the dissent repeatedly asserts, without any analysis, that the "plain language" of the provision establishes a fundamental "right to access the courts," see Dissenting Op. at 42, 44, 45, the text of the provision actually focuses directly on the right of Georgians to litigate their cases in person or by attorney (or, originally, both). It does not, on its face, appear to be an express right of access to the courts provision. Indeed, as the *Nelms* Court discussed and the dissent makes no effort to refute, the constitutions of several of our sister states contain broad "access to the courts" provisions, the

---

[1] For the extent to which the Framers contemplated the application of international law in American courts and their concern that this body of law be administered uniformly in the federal courts, see The Federalist: No. 3, at 22, by John Jay (Bourne ed. 1947, Book I); No. 80, at 112 and 114; No. 83, at 144, and No. 82, by Alexander Hamilton (Bourne ed. 1947, Book II); No. 42, by James Madison (Bourne ed. 1947, Book I). Thomas Jefferson, speaking as Secretary of State, wrote to M. Genet, French Minister, in 1793: "The law of nations makes an integral part . . . of the laws of the land." I Moore, Digest of International Law (1906), 10. . . . Also see Warren, The Making of the Constitution, Pt. II, c. I, at 116; Madison's Notes in 1 Farrand 21, 22, 244, 316. . . .
*Banco Nacional de Cuba*, 376 U. S. at 451, n. 12.

language of which is entirely different. See 253 Ga. at 411-413 & n. 2 (comparing the constitutions of Florida, Kentucky, and Alabama).[2] Nor does the dissent cite any history or contemporaneous discussion (official or not) suggesting that our "right to the courts" provision was meant to establish a broad or unfettered right of access to the courts.

To the contrary, if one looks beyond the plain language of the provision, the history confirms its meaning and its perceived need at the time — to guarantee the right to choose self-representation or representation by counsel in all cases in Georgia's courts. Such a limited purpose for a constitutionally established, stand-alone right may seem counterintuitive for lawyers and judges operating in a world where it has been settled for decades that the Sixth and Fourteenth Amendments to the United States Constitution protect the right of criminal defendants to represent themselves. See *Faretta v. California*, 422 U. S. 806, 807 (95 SC 2525, 45 LE2d 562) (1975). However, the need to expressly guarantee the right to self-representation in all cases was more important to citizens in the earlier days of the Republic. See id. at 830, n. 39 ("The Founders believed that self-representation was a basic right of a free people. Underlying this belief was not only the antilawyer sentiment of the populace, but also the 'natural law' thinking that characterized the Revolution's spokesmen."); id. at 828-829 & n. 38 ("After the Declaration of Independence, the right of self-representation, along with other rights basic to the making of a defense, entered the new state constitutions in wholesale fashion." (citing Article 58 of the Georgia Constitution of 1777 and Article III, Section VIII of the Georgia Constitution of 1798)). See also *Iannaccone v. Law*, 142 F3d 553, 556-558 (2d Cir. 1998) (discussing the history of the right to self-representation in civil cases). Even today the right of self-representation in *federal* civil cases is protected only by statute (albeit a statute that dates back to the formative Judiciary Act of 1789). See id. at 556; 28 USC § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."). Thus, while the

---

[2] It should be noted that even where there exists an express "right of access to the courts," statutes requiring the unsuccessful litigant to pay the prevailing party's attorney fees have been upheld. See, e.g., *Florida Patient's Comp. Fund v. Rowe*, 472 So2d 1145, 1147-1149 (Fla. 1985) (unanimously upholding Florida statute awarding reasonable attorney fees to the prevailing party in medical malpractice cases). See also *Evans ex rel. Kutch v. Alaska*, 56 P3d 1046, 1064 (Alaska 2002) (upholding a statutory offer of judgment scheme for tort cases and declining to expand the "right of access to the courts" based upon the Alaska Constitution's due process clause beyond "impediments to actual access to the courts").

dissent contends that construing the "right to the courts" provision as a "mere right to self-representation in the courts" is so constricting as to render the provision "meaningless," Dissenting Op. at 42 & n. 6, that contention reflects a profound misunderstanding of our history and a profound disregard for the right to self-representation.

As discussed in the dissenting opinion, the "right to the courts" provision emerged first during the 1877 convention as a proposal by Mr. Key to amend the due process clause, and then the following day in an amendment by Mr. Tift, as recounted in *Nelms* and *Bloomfield v. Liggett & Myers, Inc.*, 230 Ga. 484 (198 SE2d 144) (1973):

> Small's A Stenographic Report of the Proceedings of the Constitutional Convention Held in Atlanta, Georgia, 1877 (Constitution Publishing Company, Atlanta, 1877) reflects the adoption of the language in 1877 as the proposal of Mr. Tift, who explained it as follows (p. 94): "Mr. TIFT. I see no provision of that kind in the printed bill before us. It is very important that every person shall be permitted to prosecute or defend his own case in any of the courts of this state. In some of the courts they have a provision that no person shall appear without an attorney. At any rate, that is the practice in nearly all of the courts. In cases where persons are not able to employ attorneys, the court appoints one for him. [Sic] Yet, I think, in every case, the person should have the right to appear himself, and by attorney also, I call for the division. Upon the division the vote was - [ayes] 101; noes 29. So the amendment was received."

*Bloomfield*, 230 Ga. at 484. Accord *Nelms*, 253 Ga. at 412.

Thus, Nelson Tift — one of the most prominent Georgians of the time and someone directly involved in the framing of the Constitution[3] — explained that the problem to which a right of *choice* provision was the solution was widespread and otherwise corroborated the conclusion that the words of the provision mean exactly what they appear to mean. That the debates leading to the 1983 Constitution focused solely on a subsidiary issue of the right of choice — whether a litigant should have the right "both" to represent himself *and* be represented by counsel — further confirms this understanding. See *Nelms*, 253 Ga. at 413 ("The vastly broader question of whether this paragraph affords an individual the right of

---

[3] Nelson Tift was a founder of the City of Albany, a three-term State Representative, a newspaper publisher and prominent businessman, and a post-bellum United States Congressman before serving as a delegate to the 1877 convention. See Biographical Dictionary of the United States Congress 1774-Present. Tift County was named in his honor.

access to the courts within the meaning appellant urges was never an issue in the [pre-1983] discussions.'').

Appellees note that the language proposed by Mr. Tift in 1877 and carried forward in relevant part to today's Constitution reflects similar language in earlier constitutions, particularly Article 58 of the original Constitution of 1777 (''No person shall be allowed to plead in the courts of law in this State, except those who are authorized so to do by the house of assembly. . . . This is not intended to exclude any person from that inherent privilege of every freeman, the liberty to plead his own case.'') and Article III, Section VIII of the Constitution of 1798 (''[N]o person shall be debarred from advocating or defending his cause before any court or tribunal, either by himself or counsel, or both.''). The text of these provisions was similarly focused on the individual's right not to be ''debarred'' from pleading or defending his case in court, rather than expressing a general right of access. See *Faretta*, 422 U. S. at 829 & n. 38 (citing the 1777 and 1798 provisions as examples of early constitutional protections of the ''right of self-representation''). Indeed, the 1877 Constitution returned to this type of focused language, instead of following the broader language used in the Constitutions of 1861, 1865, and 1868 (''The right of the people to appeal to the courts . . . shall never be impaired.'').

In sum, although the dissent repeatedly refers to the ''right to *access* the courts,'' see Dissenting Op. at 42 & n. 6, 45, n. 13 (emphasis supplied), neither Mr. Key's proposal, nor Mr. Tift's proposal, nor the heading or text of the constitutional provision itself, nor the debates regarding the 1983 Constitution, nor any other historical evidence identified by the dissent makes mention of protecting unfettered ''access'' to the courts. Indeed, the dissent can express its interpretation of the ''plain language'' of the provision only by adding a word that does not appear in it, and which our constitutional history does not support reading into it. For these reasons, our leading precedents on this issue clearly reached the right result.[4]

3. Consistent with the discussion above, the *Bloomfield* Court held that, ''considering the prior constitutional history of this subject we view [the pre-1983] provision of the Constitution as primarily intended to guarantee the right of self-representation in the courts of this State . . . or by an attorney, or both.'' 230 Ga. at 484. The Court then added that the ''right to the courts'' provision ''only incidentally recogniz[es] the inherent right of access to the

---

[4] I note that the trial court unaccountably failed to cite any of our binding precedents on this issue, instead relying solely on dicta from a Court of Appeals case.

courts." Id. The Court in *Nelms* similarly stated that "it is axiomatic that an individual must have access to the courts in order to assert the right of self-representation provided by [the right to the courts provision]." 253 Ga. at 413. To that I would add that the entire existence of our court system and all of the constitutional provisions related thereto are premised on the understanding that citizens will have access to take their cases to court. But that hardly supports the claim that the "right to the courts" provision provides an express or "unfettered" right of access to the courts, as appellees argue. Nor does it mean, as the dissent would have it, that this Court has license to roam through and approve or disapprove, using entirely undefined standards, the myriad of restrictions and limitations that the legislature and our case law have placed upon who can go to court, when they can go to court, what it costs to file a case or pleadings, what causes of action may be brought, what evidence is allowed or prohibited in support of those claims, the standards and burden of proof for such claims, etc. There are entire chapters of the Georgia Code and many decisions by this Court that establish and uphold such restrictions.

The *Nelms* Court therefore properly concluded that, despite a right of access to the courts being "axiomatic," it is not express, and "we decline to give this constitutional provision the expansive interpretation sought." Id. *Bloomfield* is entirely consistent with this position. There the Court explained that "one having exercised his inherent right of access and having pleaded his case, in person, or by attorney, or both, subjects himself to the inherent power of the court to control its proceedings." 230 Ga. at 484. The Court then rejected the asserted "access" claim without scrutinizing the merits of the stay the trial court had ordered. Id.

4. To the extent that the dissent means to argue that arbitrary, discriminatory, or excessive limitations on the ability of litigants to access the courts may be challenged, I agree. But instead of simply opining whether or not we judges think a challenged limitation on access is fair, as the dissent seems to do, such challenges should be raised and must be reviewed under more well-established standards for due process and equal protection claims. We have done so in other "access to the courts" cases. See, e.g., *Couch v. Parker*, 280 Ga. 580, 582 (630 SE2d 364) (2006) (due process); *Eubanks v. Ferrier*, 245 Ga. 763, 766 (267 SE2d 230) (1980) (due process and equal protection); *State v. Sanks*, 225 Ga. 88, 89 (166 SE2d 19) (1969) (due process). It is a high hurdle, because the United States Supreme Court has made clear that departures from the American Rule are not impermissible per se but instead may be properly implemented by statute. See *Life & Cas. Ins. Co. of Tenn. v. McCray*, 291 U. S. 566, 569 (54 SC 482, 78 LE 987) (1934) (upholding an Arkansas statute awarding attorney

fees against insurance companies which, "in good faith and upon reasonable grounds," fail to pay claims within the time specified in the policy, explaining that "[t]here are systems of procedure neither arbitrary nor unenlightened, and of a stock akin to ours, in which submission to such a burden is the normal lot of the defeated litigant, whether plaintiff or defendant. . . . Nothing in the Fourteenth Amendment forbids a like procedure here. The assurance of due process has not stereotyped bills of costs at the rates known to the [Founding] Fathers.").

Appellees do not raise such challenges in this case, perhaps because they would obviously fail. The fee-shifting provisions of OCGA § 9-11-68 do not flatly deny anyone *access* to the courts, as statutes of limitation and repose and other restrictions that have survived judicial scrutiny can be said to do. Litigants remain free to file and defend tort cases, even if they receive a settlement offer and even if they elect to reject the offer. There is also little question that OCGA § 9-11-68 is rationally related to the State's legitimate objective of "encourag[ing] litigants in tort cases to make and accept good faith settlement proposals in order to avoid unnecessary litigation." Majority Op. at 29.

Nor can a credible argument be made, at least on the record in this case, that the statute substantially impedes, or "chills," litigants from filing and pursuing their claims, in violation of due process or equal protection. OCGA § 9-11-68 was originally enacted in 2005. With that statute on the books, *these* appellees accessed the court by filing their tort claims. They then pursued those claims vigorously, ignoring a settlement offer, until the claims were finally resolved with a grant of summary judgment against them, the appeal of which they did not pursue. (That final judgment, by the way, determines as a matter of fact and law that the value of appellees' claims was zero, so that appellants' settlement offer of $5,000 was reasonable.) Appellees did not challenge OCGA § 9-11-68 or contend that it had affected their case until after the merit (or lack of merit) of their claims had been determined through the usual court processes and until after an award of attorney fees was entered.[5]

In short, there is no evidence that these appellees' rights were chilled in the slightest. Consequently, their facial attack on the constitutionality of OCGA § 9-11-68 must fail, as it is clear that the

---

[5] The dissent calls the $53,087.15 in attorney fees and expenses "staggering." Dissenting Op. at 45, n. 14. The issue of the reasonableness of those fees and expenses remains for the trial court to decide on remand. However, if those substantial fees and expenses are found to be reasonable in light of what the appellants had to pay to defend themselves against what proved to be a case not worthy even of going to a jury, their size would reflect more on the appellees' conduct and decisions than the appellants'.

statute may be constitutionally applied in many cases, such as this one and others in which tort plaintiffs (or defendants) are demonstrably undeterred from pursuing (or defending) claims, as well as the many cases in which parties can reasonably estimate the value of their case and nevertheless refuse to accept a settlement offer in that range (plus or minus 25%). It may sometimes be difficult to make such estimates, but as Justice Holmes once said, "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." *Nash v. United States*, 229 U. S. 373, 377 (33 SC 780, 57 LE 1232) (1913) (explaining that this rule applies even in criminal cases where "[i]f [the litigant's] judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death").

Outside the First Amendment overbreadth context, a plaintiff can succeed in a facial challenge only by "'establish(ing) that no set of circumstances exists under which the [statute] would be valid,' i.e., that the law is unconstitutional in all of its applications," or at least that the statute lacks a "'"plainly legitimate sweep."'" *Washington State Grange v. Washington State Republican Party*, 552 U. S. 442, 449 (128 SC 1184, 1190, 170 LE2d 151) (2008) (citations omitted). That has not been done in this case. Like the trial court's, the dissent's assertion that OCGA § 9-11-68 will have a broad "chilling" effect on tort litigants is entirely speculative, unsupported by the record or other evidence, and contradicted by the fact that thousands of tort cases continue to be filed and defended in the courts of this State.

5. On motion for reconsideration, appellees contend that the Court has disregarded a line of our cases beginning with *Tift v. Towns*, 63 Ga. 237 (1879), which discuss the circumstances under which attorney fees and costs may be imposed on losing parties and cite the "right to the courts" provision. I agree that the majority should address these cases, given that it relies significantly on stare decisis in reaching its result. Because the majority opinion does not mention these cases, I will explain why I do not believe they are controlling.

Although it was decided after ratification of the 1877 Constitution, *Tift v. Towns* does not mention the "right to the courts" or any other constitutional provision. Instead, the Court simply stated and relied upon the American Rule, which was and is the background law in this State. See 63 Ga. at 242 (reversing an award of attorney fees as damages to the prevailing defendant, explaining that "[w]here there is a *bona fide* controversy for the tribunals to settle, and the parties cannot adjust it amicably, there should be no burdening of one with the counsel fees of the other, unless there has been wanton or excessive indulgence in litigation").

The next case in the series addressed a claim for attorney fees under the civil code at the time, on the ground that the lawsuit was brought in bad faith. See *Traders' Ins. Co. v. Mann*, 118 Ga. 381, 384 (45 SE 426) (1903). The Court discussed the bad faith exception to the background rule, explaining that while costs and interest are awarded to the prevailing party, "it has long been the policy of Georgia not to require the defendant to pay the expense of obtaining a judgment against himself." Id. at 386. This time the Court quoted the "right to the courts" provision in passing, noting that it "is a privilege granted the defendant as well as the plaintiff," but without discussing its text or history or explaining why it would apply to the issue at hand. Id.

A few years later in *Fender v. Ramsey & Phillips*, 131 Ga. 440 (62 SE 527) (1908), the Court said that "[t]he constitutional right to appeal to the courts . . . authorizes a fair and legitimate testing of one's bona fide claim of right," so that "[a] litigant is not subject to be penalized by the award of damages whenever he loses his case. Otherwise every man would enter the doors of the court-house, no matter how honestly or with what probable cause, with the danger of damages hanging over him." Id. at 442. This case again appears to accurately apply the then-applicable statutory and common law rules regarding awards of attorney fees and litigation expenses, but it does not analyze, quote, or even accurately paraphrase the then-applicable constitutional provision. Instead, the *Fender* Court used the language of the 1861-1868 Constitutions, which was revised in 1877 to revert back to the 1777 and 1798 Constitutions' focus on the right to self-representation. See Division 2 above.

The subsequent cases in this line simply cite or quote the prior cases in discussing claims for attorney fees awarded under the statutory and common law of the time. The cases sometimes quote or summarize the "right to the courts" provision, but without any examination of the text or history of that constitutional provision or any mention of the dozens of other Georgia appellate cases that treat it, in accordance with its text and history, as a provision primarily protecting the right to choose self-representation. Our most recent case in this line, for example, simply quotes *Fender* and refers to the 1983 "right to the courts" provision in truncated form (omitting "either in person or by an attorney") and without analysis. See *David G. Brown, P.E., Inc. v. Kent*, 274 Ga. 849, 851 (561 SE2d 89) (2002).

These cases all appear to reach the right result, because under the statutory and common law at the time each case was decided, an award of attorney fees to the prevailing party was not allowed under the circumstances presented. The cases, however, do not support the appellees' broad contention that the "right to the courts" provision

prohibits a person from being "punished for exercising his right to plead his claim in court." Motion for Reconsideration at 27. To the contrary, these cases each discuss statutory and common law exceptions from the background American Rule, which have long authorized monetary penalties of various types and amounts against certain litigants. See, e.g., *Mann*, 118 Ga. at 386 (noting that costs and interest "are the only damages *which the law imposes* in such cases" (emphasis supplied)); *Kent*, 274 Ga. at 850 ("*Generally*, expenses for defense of a suit are unavailable *unless authorized by statute.*" (emphasis supplied)). See also *Vogtle v. Coleman*, 259 Ga. 115, 117 (376 SE2d 861) (1989) ("The American rule has been that expenses for defending a suit are generally unavailable *unless authorized by a specific statute.*" (emphasis supplied)).

Indeed, Georgia now has dozens and dozens of statutory provisions, and even one constitutional provision, authorizing awards of litigation costs and attorney fees to prevailing parties, including many that do not require a showing that the litigation was frivolous or pursued in bad faith. See, e.g., Ga. Const. of 1983, Art. I, Sec. III, Par. I (d) ("The General Assembly may provide by law for the payment by the condemnor of reasonable expenses, including attorney's fees, incurred by the condemnee in determining just and adequate compensation" in takings cases); OCGA § 4-11-35 (a) ("Any person who has been damaged by reason of a violation of this article [protecting farm animal, crop, and research facilities] may recover all actual and consequential damages, punitive damages, and court costs, including reasonable attorneys' fees, from the person causing such damage."); OCGA § 7-6A-6 (c) (1) ("The relief granted in an action pursuant to subsection (b) of this Code section [of the Fair Lending Act] . . . shall not exceed the sum of the amount of all remaining indebtedness of the borrower under such loan and reasonable attorneys' fees in such individual action"). See generally OCGA §§ 9-15-1 to 9-15-15 (providing for awards of litigation costs in civil cases, including attorney fees in some instances).

None of the cases in the *Tift v. Towns* line held that such a statute might be held unconstitutional; all of those cases simply applied the laws then on the books. We now have a new statute, first enacted by the General Assembly in 2005. See OCGA § 9-11-68. It reflects the "policy of Georgia," *Mann*, 118 Ga. at 386, that continuing tort litigation after rejecting a good faith settlement offer may constitute "wanton or excessive indulgence in litigation" and authorize "the burdening of one [litigant] with the counsel fees of the other" incurred after that rejection, *Tift v. Towns*, 63 Ga. at 242, if the ultimate judgment, after such continued litigation, is significantly lower than the settlement offer. This legislative policy judgment, one of many departing from the American Rule, is entitled to

substantial deference from this Court. See *Alyeska Pipeline Svc. Co. v. Wilderness Society*, 421 U. S. 240, 247-262 (95 SC 1612, 44 LE2d 141) (1975) (reviewing the history of the American Rule in federal courts and concluding that "it is apparent that the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine"). To the extent that the *Tift v. Towns* line of cases may be read to question, based upon the "right to the courts" provision, statutory departures from the American Rule, those cases are inconsistent with the text and history of that constitutional provision as well as our *Bloomfield/Nelms* line of precedent.

6. Should a case be brought in which it is established that a party was actually precluded from filing, defending, or maintaining a meritorious tort case because of OCGA § 9-11-68, we can address any constitutional claims raised in that concrete setting. This is clearly not such a case, and for that reason I join the majority opinion, with the exception and additional points discussed above.

HUNSTEIN, Chief Justice, dissenting.

Art. I, Sec. I, Par. XII provides that "[n]o person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state." This language plainly and unambiguously accords the people of this State the fundamental right to access the courts.[6] The majority, however, follows the holding in *Bloomfield v. Liggett & Myers*, 230 Ga. 484 (198 SE2d 144) (1973) to deny the people of this State this fundamental right by constricting the scope of Art. I, Sec. I, Par. XII to a mere right to self-representation in the courts. The source for this constriction is not the plain language of the constitutional provision itself. It is not the official account of the 1877 Constitutional Convention, responsible for the 1877 Constitution in which the right to access the courts first appeared. See Journal of the Constitutional Convention of the People of Georgia ("Journal"). It is not even the personal recollections of a convention member, such as Mr. Nelson Tift, who proposed the resolution to add this language as a freestanding provision in the constitution, or Mr. John C. Key, who proposed adding virtually identical language as part of the due process clause. The sole basis for the majority's interpretation of Art. I, Sec. I, Par. XII is a single passage in one source: Small's A

---

[6] Because a right to the courts would be rendered meaningless if it did not provide a right to access the courts, I cannot agree with the special concurrence's interpretation of Art. I, Sec. I, Par. XII that is contrary to our rules of constitutional and statutory construction. See generally *Blum v. Schrader*, 281 Ga. 238 (2) (637 SE2d 396) (2006) (basic rule of constitutional construction that no provision is presumed to be without meaning).

Stenographic Report of the Proceedings of the Constitutional Convention Held in Atlanta, Georgia, 1877 (Constitution Publishing Company, Atlanta, 1877), see *Bloomfield,* supra at 485, even though, as the title page of that book reflects, its contents were "reported by Samuel W. Small *for the Atlanta Constitution."* (Emphasis supplied.)[7]

Samuel W. Small was not a member of the 1877 Constitutional Convention. Journal, supra, pp. 7-10 (initial role call); id. at 655-662 (index of members). He was neither one of the temporary secretaries at the Convention, id. at p. 7, nor the official secretary of that convention. See id. at 15 (election of Mr. Nisbet as convention secretary). Mr. Small was, instead, a reporter for the Atlanta Constitution, a newspaper that printed Mr. Small's report in its daily edition, see the archives for that newspaper available at http://pqasb. pqarchiver.com/ajc_historic/advancedsearch.html?new=1,[8] and whose publishing company,[9] rather than the state printer and publisher,[10] thereafter compiled the reports in the book on which the majority relies. Mr. Small attempted to compile in shorthand form an account of the discussions he overheard at the convention; the title page to his book asserts that it sets forth "debate in full on all questions before the convention."[11] However, contrary to the title page and the majority's claim, the account Mr. Small compiled is demonstrably inaccurate, as readily exemplified by the errors in his report regarding the very resolution introduced to commend him and other members of the media at the conclusion of the convention.[12] Nothing in that resolution

---

[7] I would like to thank the Georgia State University College of Law Library for its loan of an original edition of Mr. Small's report from its rare books collection. An accurate image of the report may also be viewed online at http://books.google.com/books?id=7vMaAAAAYAAJ&printsec=frontcover&dq=small+stenographic+report+of+the+proceedings+of+the+constitutional+convention+held+in+atlanta,+georgia+1877&source=bl&ots=93rTNRtbCG&sig=Y6fgEaRj31AZGx2PniL8gi9zZUU&hl=en&ei=PyVXS_q-LdWztgelrpi-BA&sa=X&oi=book_result&ct=result&resnum=1&ved=0CAcQ6AEwAA#v=onepage&q=&f=false.

[8] A search using the search term "convention" with the date range of July-August 1877 will generate a synopsis of the articles published by the Atlanta Constitution setting forth their reporter's account of the convention debates. Payment is required to view the articles themselves.

[9] See Ga. L. 1877, Part II, Local and Private Laws, Title 1, Corporations, Chap. 8, Publishing Companies, Act No. 227, approved February 27, 1877, p. 227 (authorizing creation of the Constitution Publishing Company for the purpose, inter alia, of publishing "the Atlanta Constitution, daily").

[10] Compare the Journal of the Constitutional Convention, supra, published by "Jas. P. Harrison & Co., State Printers and Publishers, 1877," and Ga. L. 1877, also known as the Acts and Resolutions of the General Assembly of the State of Georgia, passed at the regular January Session, 1877 (published by same).

[11] The Journal, without any discussion, is 701 pages long. Mr. Small's book, allegedly setting forth all the discussion, is only 502 pages long, including the index.

[12] According to the Journal, the resolution was as follows:
That the thanks of this Convention are due, and are hereby tendered, to Samuel W. Small, Esq., stenographic reporter, for the very able, *faithful* and impartial manner

commending Mr. Small recognizes him as "the official reporter of the Convention," as the majority claims. Maj. Op., p. 26. Instead, all it reflects is a gesture of appreciation made by the convention members to the reporters covering their efforts, in the same manner the General Assembly has indicated its appreciation for the "quality comprehensive coverage of the Georgia legislative session" when commending the Lawmakers broadcast on Georgia Public Television. See Senate Resolution 564, adopted March 29, 2005.

The majority does not and, indeed, cannot deny that its interpretation of Art. I, Sec. I, Par. XII is based entirely upon the account of Mr. Small, a newspaper reporter for the Atlanta Constitution. I cannot agree to the use of Mr. Small's demonstrably inaccurate book as a legitimate source to construe a constitutional provision contrary to its plain language. The majority's reliance on an unofficial journalist's account is in direct contravention of our precedent refusing to accept as authority even the actual videotaped recordings of statements made by legislators themselves because those recordings are not official accounts on which this Court may rely when interpreting our statutes. See, e.g., *DeKalb Dev. Auth. v. State of Ga.*, 286 Ga. 36 (4), n. 4 (684 SE2d 856) (2009). We do not use those sources, notwithstanding their unquestioned accuracy, authenticity or validity, because they are *not official*. If all we require now is that a source look accurate and be cited by authorities other than courts, then we might as well just start relying on Wikipedia entries. Nor can the unfortunate reliance on Mr. Small's account in other opinions of this Court ameliorate any reliance on this unofficial source. None of these other opinions acknowledge that Mr. Small was

---

in which he has reported the proceedings of this Convention; and also to the following gentlemen: Messrs. J.C. Jones, Macon Telegraph and Messenger; S. W. Postell, Griffin News; Howard Williams, of the Columbus Times; P. A. Stovall, Augusta Chronicle and Constitutionalist, and Sidney Herbert, of the Savannah News, which resolution was agreed to.

(Emphasis supplied.) Journal, supra at p. 566. According to Mr. Small, however, the following occurred:

Mr. SPENCE, of the 35th district, offered the following resolution:

Resolved, That the thanks of this convention are due and are hereby tendered to Samuel W. Small, Esq., stenographic reporter, *for the very able and impartial manner* in which he has reported the proceedings of this convention.

Mr. NISBET. Mr. President, before this resolution is adopted, I would like to offer the following amendment:

And also to the correspondents of the state press represented on this floor.

Mr. SPENCE of the 35th. Very well, sir; I accept that amendment.

The resolution, as amended, was unanimously adopted.

(Emphasis supplied.) Small's Stenographic Report, supra at p. 444. It thus appears that Mr. Small failed to report that Mr. Spence's resolution included the word "faithful" as set forth in the Journal and he omits entirely the names of the other journalists and the newspapers for which they worked. These omissions are not corrected elsewhere in Mr. Small's account.

a journalist reporting for the Atlanta Constitution; none of them recognize that he was not the official reporter of the 1877 Constitutional Convention. Those opinions improperly relied on Mr. Small's book. Because it is this Court's purpose to correct errors, not sanctify and perpetuate them, I would disapprove the use of Mr. Small's account in those other opinions for the same reason I reject it here.[13]

The majority tries to "have its cake and eat it, too," by first denying a right to access the courts but then hedging its ruling by stating that, "even if" such a right exists, Maj. Op., p. 28, the statute at issue here does not violate it. This is no way to interpret our State's constitution. A right to access the courts is too important, too fundamental to the maintenance of all our other rights, to be accorded such casual treatment. Whether OCGA § 9-11-68 (b) (1) violates our right to access the courts is a close question on which reasonable minds may well disagree.[14] The existence of a right to access the courts, however, is not a close question at all. That right is clearly and plainly set forth in the unambiguous language of Art. I, Sec. I, Par. XII. Because the majority refuses to acknowledge the

---

[13] Moreover, even if Mr. Tift did indeed make the statements attributed to him by Mr. Small, neither the majority nor the *Bloomfield* Court takes into account the fact that the Journal (and Mr. Small) reflect that another convention member, Mr. Key, had proposed virtually identical language the previous day, seeking to add the right to access the courts as an explicit part of the due process clause. Journal, supra at 104-105. While his resolution on July 23, 1877 did not prevail, it is no stretch to conclude that the convention members who approved Mr. Tift's resolution on July 24, the very next day, see id. at p. 119, must have remembered the concerns raised by Mr. Key (implicit in his resolution and explicitly "reported" by Mr. Small, who claimed that Mr. Key expressed concern that this right was "not too well guarded, and . . . occur to me as necessary to follow" the due process language. Small, A Stenographic Report, supra at 82). There is thus no basis to conclude that the convention's approval of Mr. Tift's stand-alone right to access the courts paragraph was based solely on the reason Mr. Small claims was set forth by Mr. Tift.

[14] I respectfully disagree with the majority that OCGA § 9-11-68 (b) (1) does not violate Art. I, Sec. I, Par. XII. Unlike parties subject to statutory penalties under OCGA §§ 9-15-14 and 13-6-11 because of their own actions in bringing frivolous suits or behaving stubbornly and unreasonably when litigating matters in the courts, OCGA § 9-11-68 (b) (1) penalizes plaintiffs with meritorious causes of action for an impossibility, namely, their failure to see into the future so as to calculate the precise amount a factfinder may award them for the damages they reasonably believed they sustained at the hands of the defendants. Yet this impossible act is required of plaintiffs by OCGA § 9-11-68 (b) (1) in order for them to decide whether to accept or reject a defendant's settlement offer; this same impossibility applies to defendants under OCGA § 9-11-68 (b) (2). No party intending to file a cause of action in tort can foresee whether she will recover "enough" money to avoid the effect of OCGA § 9-11-68 (b) (1). The chilling consequence of the impossible task OCGA § 9-11-68 (b) (1) places on a person contemplating accessing a court to prosecute his or her legitimate cause of action is amply demonstrated by the facts in this case, in which plaintiffs, stung by the negative comments broadcast throughout metro Atlanta by the father of an unhappy customer, now face paying a staggering $53,087.15 in attorney fees and expenses because of the legal redress they sought. OCGA § 9-11-68 (b) (1) does not merely "set forth certain circumstances under which attorney's fees may be recoverable" as the majority holds, Maj. Op., p. 28: rather, as the trial court correctly held, OCGA § 9-11-68 (b) (1) serves to impede, if not outright deter, plaintiffs with meritorious causes of action from filing suit to obtain judicial resolution of their grievances because of the financial peril in which that statute places them.

existence of that right by repudiating the improper reliance the Court in *Bloomfield* placed on a journalist's unofficial account of the 1877 Constitutional Convention, I must respectfully dissent to the majority's opinion.

I am authorized to state that Justice Benham joins this dissent.

DECIDED MARCH 15, 2010 —
RECONSIDERATION DENIED APRIL 9, 2010.

*Greenberg Traurig, Mark G. Trigg, Ryan C. Grelecki*, for appellants.

*Molden, Holley & Thompson, Regina S. Molden, Oni A. Holley*, for appellees.

*Powell Goldstein, Eric P. Schroeder, LeeAnn Jones, William V. Custer IV, Charles M. Cork, Jr.*, amici curiae.