310 Ga. 127
FINAL COPY

S19G1486.  NORMAN et al. v. XYTEX CORPORATION et al.

PETERSON, Justice.

"Respect for life and the rights proceeding from it are at the heart of our legal system and, broader still, our civilization." *Fulton-DeKalb Hosp. Auth. v. Graves*, 252 Ga. 441, 444 (3) (314 SE2d 653) (1984) (quoting *Cockrum v. Baumgartner*, 447 NE2d 385, 389 (Ill. 1983)). For this reason, this Court has repeatedly refused to allow damages in tort that necessarily presume that life itself can ever be an injury. See, e.g., *Etkind v. Suarez*, 271 Ga. 352, 352-353 (1) (519 SE2d 210) (1999); *Atlanta Obstetrics & Gynecology Group v. Abelson,* 260 Ga. 711 (398 SE2d 557) (1990); *Graves*, 252 Ga. at 443-444 (3). We reaffirm that rule today. But that rule does not fully resolve this appeal, which is about what sort of damages the rule actually bars.

Wendy and Janet Norman allege that Xytex Corporation, a sperm bank, sold them human sperm under false pretenses about the characteristics of its donor, and that the child conceived with

that sperm now suffers from a variety of impairments inherited from the sperm donor. The Court of Appeals affirmed the dismissal of all but one of the Normans' claims on the basis of *Etkind* and *Abelson*. See *Norman v. Xytex Corp.*, 350 Ga. App. 731, 732-734 (830 SE2d 267) (2019). We granted certiorari and now hold that claims arising from the very existence of the child are barred, but claims arising from specific impairments caused or exacerbated by defendants' alleged wrongs may proceed, as may other claims that essentially amount to ordinary consumer fraud. We affirm in part, reverse in part, and remand the case for further proceedings consistent with the principles we explain herein.

1. *Relevant facts of the case.*

Because we are reviewing an order on a motion to dismiss, we take the allegations in the complaint as true and resolve all doubts in favor of the Normans. See *Williams v. DeKalb County*, 308 Ga. 265, 270 (2) (840 SE2d 423) (2020). In that light, Xytex represented that it carefully screened the personal health, criminal history, and family history of all donors; that donors were put through rigorous

physical exams and interviews to confirm the accuracy of the information donors provided; and that because of its thorough screening process, fewer than five percent of candidates became donors. Xytex also represented that it required sperm donors to update their medical history every six months; that the company would update the donors' profiles with any new information; and that, if the company received "medically significant" information about a donor, it would notify patients who used that donor's sperm. Xytex promoted Donor #9623 as one of its "best" sperm donors on account of his profile in which he represented that he was a Ph.D. candidate with an IQ of 160 and had no history of mental health issues or criminal activity.

On his Xytex questionnaire, Donor #9623 lied about his mental health. Xytex never asked him to verify his answers, supply his medical records, or sign a release for such records. Xytex also never asked about his criminal history or asked him to provide any identification. At Donor #9623's initial visit, Xytex's employee Mary Hartley told him that intelligent donors with high levels of

education were more popular sperm donors and encouraged Donor #9623 to exaggerate his IQ and education. Although he claimed he had advanced degrees, Donor #9623 had no degrees at all when he completed his questionnaire.

During the time Donor #9623 sold sperm to Xytex, from 2000 to 2016, he was arrested for burglary, trespassing, DUI, and disorderly conduct; he pleaded guilty to burglary in 2005.[1] After a lawsuit was filed against Xytex in 2014 concerning Donor #9623, he provided Xytex with forged graduation diplomas that it accepted without question.

Based on the representations that Xytex made regarding its screening procedures and the representations made in Donor #9623's profile, the Normans purchased Donor #9623's sperm. Wendy was inseminated with the sperm, and she gave birth to a son, A. A., in June 2002. Xytex was not involved in the insemination

---

[1] The Normans do not specify in their complaint the dates of Donor #9623's arrests for the other offenses. But viewing the allegations in the light most favorable to the Normans, we infer at this procedural posture that the arrests preceded the Normans' use of Donor #9623's sperm.

process.

A. A. has been diagnosed with Attention Deficit Hyperactivity Disorder and Thalassemia Minor, an inheritable blood disorder for which Wendy is not a carrier. A. A. regularly has suicidal and homicidal ideations, requiring multiple periods of extended hospitalizations. A. A. regularly sees a therapist for his anger and depression, and he takes ADHD, anti-depressant, and anti-psychotic medications.

In March 2017, A. A. conducted an internet search on Donor #9623, and he and the Normans discovered in publicly available documents that the representations Xytex made regarding Donor #9623 were false. In reviewing those documents and through interviewing Donor #9623, the Normans learned that, before Donor #9623 began selling his sperm to Xytex in 2000, he had been hospitalized for mental health treatment and diagnosed with psychotic schizophrenia, narcissistic personality disorder, and significant grandiose delusions.

Following their discoveries, the Normans brought suit against

Xytex (Xytex International and Xytex Corporation, a subsidiary), Hartley, Xytex's Medical Director J. Todd Spradlin, and a number of John Does (collectively, the "Defendants"). The Normans raised claims for fraud, negligent misrepresentation, products liability and/or strict liability, products liability and/or negligence, breach of express warranty, breach of implied warranty, battery, negligence, unfair business practices, specific performance, false advertising, promissory estoppel, and unjust enrichment. The Defendants filed a motion to dismiss the complaint on various grounds, including on the basis that the Normans were asserting "wrongful birth" claims that are not legally recognized under *Abelson*. The trial court denied the Defendants' motion to dismiss in part and granted it in part,[2]

---

[2] The trial court considered alternative grounds to dismiss the Normans' claims, including statutes of limitations, but rejected the motion as to most of these alternative grounds. The trial court granted the Defendants' motion to dismiss the Normans' battery claim on the alternative ground that there was no allegation that any defendant ever touched or threatened to touch either plaintiff in a harmful, insulting, or provoking manner. The trial court also dismissed the Normans' false advertising claim because the Normans were not seeking injunctive relief. The trial court also ruled that a claim based on a fear that A.A. might someday be diagnosed with schizophrenia was not sufficient to support an action for damages and dismissed a claim for such damages as unripe. These alternative rulings are not before us.

concluding that all of the Normans' claims for relief, with the exception of the specific performance claim,[3] were claims for "wrongful birth camouflaged as some other tort."

The Normans appealed to the Court of Appeals. The Court of Appeals held that despite the Normans' attempts to characterize their claims as some other cause of action, all of their claims "directly relate to the fact that, had they known the health, educational and criminal history of Donor #9623, they would not have purchased his sperm from the Appellees." *Norman*, 350 Ga. App. at 734. Relying on this Court's statement in *Abelson* "that life, even life with severe impairments, may [not] ever amount to a legal injury," the Court of Appeals affirmed the trial court's dismissal of the Normans' claims. Id. at 715 (citation and punctuation omitted).

2.    *Abelson does not bar every claim connected to the conception or birth of a child.*

---

[3] In their claim for specific performance, the Normans alleged that the Defendants had withheld "significant information" about the Defendants' sperm donors, and the Normans sought to have that information released to other "sperm purchasers." Because the trial court did not dismiss this claim and that ruling was not cross-appealed, this claim is not before us.

The Normans argue that the Court of Appeals erred in concluding that *Abelson* barred all of their claims for relief because *Abelson*'s holding must be read narrowly in the light of the facts presented in that case. They also argue that the facts of this case more closely resemble the facts of *Graves*, 252 Ga. 441, where this Court allowed a claim for damages arising from a negligent sterilization procedure. Although neither of these cases squarely address all of the claims raised by the Normans, some of the principles set forth in these cases apply to bar at least some of their claims. But the Court of Appeals erred in applying *Abelson* broadly to bar nearly all of their claims.

We review the grant of a motion to dismiss de novo. *Northway v. Allen*, 291 Ga. 227, 229 (728 SE2d 624) (2012). And the well-established test that must be satisfied before a motion to dismiss can be granted is a demanding one:

> A motion to dismiss for failure to state a claim upon which relief may be granted should not be sustained unless (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support

thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought.

*Williams*, 308 Ga. at 270 (2).[4] In reviewing such a motion, any doubts regarding the complaint must be construed in favor of the plaintiff. *Austin v. Clark*, 294 Ga. 773, 775 (755 SE2d 796) (2014). "To state a claim sounding in tort upon which relief may be granted, a complaint must identify (1) a legal duty the defendant owes to the plaintiff, (2) the defendant's breach of that duty, and (3) an injury to the plaintiff that is (4) proximately caused by the defendant's breach." *Abelson*, 260 Ga. at 715 n.6 (citing William L. Prosser & W. Page Keeton, *The Law of Torts* 164-165 (5th ed. 1984)).

---

[4] This Georgia test is more difficult for movants to pass than the equivalent federal test, because the federal test imposes on plaintiffs a "more stringent pleading standard[ ]." *Collins v. Athens Orthopedic Clinic, P.A.*, 307 Ga. 555, 565 (4) (837 SE2d 310) (2019) ("Compare *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (129 SCt 1937, 173 LE2d 868) (2009) (under federal law, legal conclusions recited in complaint 'must be supported by factual allegations' that 'plausibly give rise to an entitlement to relief'), with *Dillingham v. Doctors Clinic, P.A.*, 236 Ga. 302, 303 (223 SE2d 625) (1976) (under Georgia law, complaint need only "give the defendant fair notice of what the claim is and a general indication of the type of litigation involved; the discovery process bears the burden of filling in details').").

(a) *Graves and Abelson.*

*Graves* and *Abelson* both involved medical malpractice claims against physicians for negligence that led to the birth of a child. In *Graves*, we considered whether a mother could maintain an action against a hospital whose staff physician negligently performed a sterilization procedure that left the mother capable of conceiving, which later resulted in the birth of a child. See 252 Ga. at 441-442. Applying traditional tort principles, we held that such wrongful conception or wrongful pregnancy claims are cognizable because they are "no more than a species of malpractice which allows recovery from a tortfeasor in the presence of an injury caused by intentional or negligent conduct." Id. at 443 (1). But we limited the amount of damages the mother could recover. We allowed "recovery of expenses for the unsuccessful medical procedure which led to conception or pregnancy, for pain and suffering, medical complications, costs of delivery, lost wages, and loss of consortium." Id. at 443 (2). We did not permit the mother to collect damages for the expenses of raising the child, however, because "a

parent cannot be said to have suffered an injury in the birth of a child." Id. at 443-444 (2).

In contrast to wrongful conception claims, which are based on allegations that the parents did not want to conceive a child at all, wrongful birth claims typically arise when parents claim they would have aborted the child had they been fully aware of the child's condition. See *Etkind*, 271 Ga. at 355 (3). In *Abelson*, we considered a damages suit against a doctor who failed to inform the plaintiff of a post-conception diagnostic test that could have diagnosed a genetic chromosomal disorder in the plaintiff's child. See 260 Ga. at 711. Again applying traditional tort principles, we concluded in *Abelson* that the claim failed under the injury prong because we were "unwilling to say that life, even life with severe impairments, may ever amount to a legal injury." Id. at 715 (citation and punctuation omitted). The plaintiffs' claims also failed under proximate causation, because the plaintiffs came to the doctor after conception, and the doctor could not be said to have caused the genetic impairment in the child. See id. at 715-716.

The parties argue about whether the present case is more like the wrongful conception claim that was allowed to proceed in *Graves* or the wrongful birth claim that was barred by *Abelson*. The parties set up a false dichotomy. Not all claims based on prenatal injuries are wrongful conception or wrongful birth claims that are governed by *Graves* or *Abelson*.

(b)   *This case is unlike Graves or Abelson, but those cases reveal an essential principle — damages that categorize life as the injury are not cognizable.*

The facts of this case do not squarely track *Graves* or *Abelson*. It is undisputed that the Normans did not seek or receive medical treatment or advice from any of the Defendants. Instead, the Normans purchased sperm from Xytex. In this way, this case is distinct from both *Graves* and *Abelson*, which both involved medical malpractice claims. See *Southeastern Pain Specialists, P.C. v. Brown*, 303 Ga. 265, 271 (2) (a) (811 SE2d 360) (2018) ("Medical malpractice exists only where the act or omission by a professional requires the exercise of expert medical judgment." (citation and punctuation omitted)).

*Graves* and *Abelson* must be read in the contexts in which those cases arose. See *Herrington v. Gaulden*, 294 Ga. 285, 287 (751 SE2d 813) (2013) ("[A]ny precedential decision must be read in the light of the facts presented in that case."). *Graves* and *Abelson* establish a key principle that affects the viability of the Normans' claims: life can never amount to a legal injury. See *Abelson*, 260 Ga. at 715 ("[W]e are unwilling to say that life, even life with severe impairments, may ever amount to a legal injury.") (citation and punctuation omitted); *Graves*, 252 Ga. at 444 (3) ("[A] parent cannot be said to have suffered an injury in the birth of a child."). Claims seeking damages for the expenses of raising a child cannot be maintained, because such claims are premised on the child's life as the injury. This principle is well understood and Georgia courts have applied it repeatedly. See *Wasdin v. Mager*, 274 Ga. App. 885, 888 (1) (619 SE2d 384) (2005) (mental distress caused by expenses of raising child not cognizable in wrongful conception case); *Vance v. T. R. C.*, 229 Ga. App. 608, 614 (4) (494 SE2d 714) (1997) (concluding that cause of action for injuries arising from child being born as an

"illegitimate child" was not cognizable because claim was based on allegations that, but for the defendant's negligence, the child would not have been born, which would have required the jury "to compare his life as an illegitimate child to nonexistence"); *Blash v. Glisson*, 173 Ga. App. 104, 104 (2) (325 SE2d 607) (1984) (barring damages based on claim that siblings had to share family income with additional child who was born when a sterilization procedure was unsuccessful).

We made clear in *Abelson* that any change to this prohibition on wrongful birth claims should come from the General Assembly, not the judiciary.[5] See 260 Ga. at 718-719. And in *Etkind*, we

---

[5] In *Abelson*, we held that "wrongful birth actions shall not be recognized in Georgia absent a clear mandate for such recognition by the legislature." *Abelson*, 260 Ga. at 714. The Normans argue that the legislature has already recognized such actions in the artificial insemination context by enacting OCGA § 43-34-37 (b). That statute, enacted in 1964, see Ga. L. 1964, p. 166, provides:

> Any physician or surgeon who obtains written authorization signed by both the husband and the wife authorizing him or her to perform or administer artificial insemination shall be relieved of civil liability to the husband and wife or to any child conceived by artificial insemination for the result or results of said artificial insemination, provided that the written authorization provided for in this Code section *shall not relieve any physician or surgeon from*

adhered to that conclusion, in part as a matter of separation of powers. See 271 Ga. at 353-354 (1). The 30 years since *Abelson* was decided have seen no act of the General Assembly that would undermine *Abelson*'s holding. Given this history and the difference between the legislative and judicial powers, it is not for the judicial branch to entertain in the first instance the question of under what circumstances life itself may ever be an injury; the legislative branch must first provide us the answer. Accordingly, we reaffirm today the rule applied in *Graves*, *Abelson*, and *Etkind*: Georgia law does not recognize claims for damages that depend on life as an injury. As explained below, some of the damages the Normans seek would require recognizing A. A.'s life as an injury, and the trial court was right to dismiss those claims.

    (c)    *Not all claims based on prenatal injuries to a child require*

---

*any civil liability arising from his or her own negligent administration or performance of artificial insemination.*

OCGA § 43-34-37 (b) (emphasis supplied).

    This statute is codified in the Code section limiting the practice of medicine, including artificial insemination, to licensed physicians and surgeons. See generally OCGA § 43-34-37. This statute applies only to the medical procedure of artificial insemination and does not include the negligent sale or screening of sperm. Because Xytex only sold sperm and did not perform any medical procedure, this statute does not apply here.

*a characterization of the child's life as an injury.*

Although Georgia law does not recognize life as an injury, there can be injuries that predate a child's birth and are not premised on the child's life as an injury. For almost 70 years, Georgia courts have recognized causes of action based on such injuries. See *Peters v. Hosp. Auth. of Elbert County*, 265 Ga. 487, 488 (1) (458 SE2d 628) (1995) (noting that Georgia law has recognized since 1951 that a child born after sustaining a tortious prenatal injury may bring an action to recover damages for the injury sustained, and concluding that, although parents could maintain their own action for the life of a stillborn, a parent could not maintain an action on behalf of a stillborn child because a child must be born alive to have a cause of action under OCGA § 51-1-9). The first case to recognize explicitly such a cause of action concluded that such actions were permitted under the common law. See *Tucker v. Howard L. Carmichael & Sons*, 208 Ga. 201, 203-207 (1) (65 SE2d 909) (1951) (permitting a child's cause of action for damages for prenatal injuries resulting from defendant's negligence in transporting mother in an

ambulance). *Tucker* has been followed consistently, firmly establishing a cause of action based on prenatal injuries. See, e.g., *Hornbuckle v. Plantation Pipe Line Co.*, 212 Ga. 504, 504 (93 SE2d 727) (1956) ("Where a child is born after a tortious injury sustained at any period after conception, he has a cause of action." (citing *Tucker*)); *Worthy v. Beautiful Restaurant*, 252 Ga. App. 479 (556 SE2d 185) (2001) (reversing grant of summary judgment to restaurant on claims by mother, as guardian of her son, seeking damages for injury to child when mother suffered food poisoning while six months pregnant); *Fallaw v. Hobbs*, 113 Ga. App. 181, 182 (147 SE2d 517) (1966) ("The right of a child to maintain an action against another to recover damages for prenatal injuries negligently inflicted has been established.").[6]

And in some situations, a cause of action may exist for pre-conception injuries. In *McAuley v. Wills,* 251 Ga. 3 (303 SE2d 258)

---

[6] Of course, Georgia also has long recognized wrongful death claims where an unborn child dies as a result of the defendant's negligence. See *McAuley v. Wills*, 251 Ga. 3, 5 (3) (303 SE2d 258) (1983) (recognizing that the rule of *Tucker* was applied in 1955 in an action for the wrongful death of a child).

(1983), we recognized that, in at least some situations, a person owes a duty of care to an unconceived child. See id. at 6 (5) ("To the extent that the trial court ruled that a person owes no duty of care toward an unconceived child, we must disagree.").[7] Based on this Court's recognition in *McAuley* that pre-conception torts could be maintainable in some circumstances, the Court of Appeals affirmed the denial of a defendant chemical company's motion to dismiss the plaintiffs' damages claim for pre-conception injuries to children resulting from the plaintiffs' exposure to the defendant's dangerous chemicals. See *Hitachi Chem. Electro-Prod. v. Gurley*, 219 Ga. App. 675, 676-677 (1) (466 SE2d 867) (1995). Thus, in both pre- and post-conception cases,[8] Georgia law has recognized that a cognizable

_____

[7] *McAuley*'s ultimate holding regarding the tort, however, was that the defendant's breach of duty was too remote from the child's injuries to constitute a proximate cause of those injuries, even if it was a cause in fact. See 251 Ga. at 6-7 (5). In that case, the plaintiff was seriously and permanently injured in a car accident. She later married, became pregnant, and gave birth to a child, who died the following day due to complications caused by the plaintiff's injuries; we held that due to problems of reasonable foreseeability, as a matter of law the car accident did not proximately cause the child's death. See id.

[8] We recognize that many of these cases involving pre-birth injuries were brought by parents on behalf of their injured children; they are cited merely for the proposition that many pre-birth injuries do not require treating life

claim may exist for pre-birth injuries to a child without deeming the child's existence an injury. Any such claims the Normans have brought are not wrongful birth claims and should not have been dismissed on that ground.[9]

(d) *The Court of Appeals did not consider whether the Normans pursued other damages that do not necessarily state their child's birth as an injury.*

One of the many allegations the Normans made is that they would not have purchased sperm from Donor #9623 had Xytex revealed the true facts about the donor. This is a classic wrongful birth claim because the necessary and direct result of not buying

---

itself as an injury. None of the cited cases addressed the question of whether the parents could assert claims in their own right. The parties have not briefed that issue, no court below has decided it, and we expressly reserve the question to the extent the Normans' claims that they bring on their own behalf concern pre-birth torts by Xytex, as opposed to post-birth torts for failing to disclose information. Cf. *Anderson v. Jones*, 323 Ga. App. 311, 317 (1) (b) (745 SE2d 787) (2013) (noting that, because parents are responsible for the medical expenses incurred in the treatment of their minor children, the "right to recover damages for medical expenses incurred in such treatment is vested exclusively in a minor child's parents" (citation and punctuation omitted)).

[9] We do not attempt to apply these legal principles to the Normans' complaint on a claim-by-claim basis. None of the parties have briefed such application with the benefit of this opinion. Moreover, the nature of the Normans' complaint makes such parsing difficult; each cause of action purports to incorporate by reference all previous paragraphs of the complaint. Accordingly, we leave it to the parties to argue these issues in the first instance on remand.

Donor #9623's sperm is that A.A. would not exist. Georgia law does not allow such a claim, and so it is barred.

Other claims that derive from A. A.'s life would also be barred. The Normans do not dispute that they wanted to conceive a child through artificial insemination. Therefore, they cannot recover the costs of pregnancy and raising A. A., such as the medical expenses of child birth and lost wages due to artificial insemination and child birth. These life-related expenses are not derivative of A. A.'s alleged genetic impairments but, rather, were incurred by bringing A. A. to life. Because the Normans wished to conceive a child, allowing them to recover the costs of childbirth or the expenses incurred by raising A. A. would impermissibly transform A. A.'s birth into a legal injury.

But those principles do not create blanket immunity for reproductive service providers and do not preclude all claims relating to the birth of a child. Damages may be recoverable as long as plaintiffs sufficiently prove that the Defendants caused the

alleged injuries (other than the life of A. A.).[10] See, e.g., *Hornbuckle*, 212 Ga. at 504. For example, the Normans alleged that they relied on Xytex's representations that it screened the medical and mental health history of its donors. The Normans also allege that Xytex represented that it would notify patients who used Donor #9623's sperm if the company received any "medically significant" information about Donor #9623, and that the company failed to do so even after Donor #9623's mental illness and criminal history came to light. And they allege that, even after a lawsuit was filed against the company concerning Donor #9623 in 2014, the company accepted his forged college graduation diplomas without verifying their authenticity and continued to promote his sperm to other patients.

It is possible that the Normans could introduce evidence that

---

[10] The Normans may have difficulty proving proximate causation and damages for their claims, but such difficulty in ultimately proving their case is not a basis to dismiss their claims at the pleading stage; at this stage, at least, there exists some possibility that the Normans could introduce some evidence to warrant some of the relief they seek. See *Collins*, 307 Ga. at 560 (2) (a).

Xytex knew well before 2014 about "medically significant" information regarding Donor #9623 that had not been communicated to the Normans. But even if Xytex became aware of this information only in 2014, there is a possibility that the Normans were harmed by their reliance on Xytex's representations that (1) it had screened Donor #9623's medical history when he first started donating his sperm in 2000, or (2) it would update patients with "medically significant" information regarding donors. See *Global Payments v. InComm Fin. Svcs.*, 308 Ga. 842, 844 (843 SE2d 821) (2020) ("Liability for a negligent representation attaches when a defendant makes a false representation upon which the plaintiff relies."). The Normans did not learn about Donor #9623's medical history until 2017, and we must accept at this procedural stage that there may exist some evidence that the Normans relied on Xytex's representations in failing to obtain a diagnosis or treatment sooner for some of A. A.'s conditions. Such delays may have exacerbated pain and other symptoms suffered by A. A.; these injuries could have been avoided or mitigated had the Normans known the truth about

Donor #9623's medical history; and the Normans may have incurred additional expenses as a result of not being told the truth sooner. See *Moore v. Singh*, 326 Ga. App. 805, 809-810 (1) (755 SE2d 319) (2014) (jury could find that plaintiff was injured from doctor's failure to diagnose a fracture sooner because, even though surgery to repair a fracture might have been required in any case, the plaintiff suffered ongoing pain during months fracture was not treated and such failure led to a more complicated surgery or recovery period); *Beatty v. Morgan*, 170 Ga. App. 661, 664 (2) (317 SE2d 662) (1984) (failure to diagnose bladder cancer led to additional months of pain and other symptoms).

As another example, the Normans also may be able to recover damages for the difference in price between the cost of the sperm they received and the fair market value of the sperm that Xytex told them they were getting. Xytex represented that Donor #9623 was one of its "best" donors, but the allegations regarding his background show otherwise.

(e) *The Normans also allege a consumer protection claim that*

*does not depend on life as an injury.*

The Normans also raise at least one consumer claim that is not barred by *Graves* and *Abelson*. For example, the Normans brought a cause of action under the Fair Business Practices Act, OCGA § 10-1-390 et seq. ("FBPA"), claiming that Xytex misrepresented the quality of its goods and services. The FBPA allows for recovery of injuries that do not depend on recognizing life as an injury, and are therefore not barred by *Graves* and *Abelson*.

The FBPA protects the public from unfair or deceptive trade practices that harm consumers. See *Henderson v. Gandy*, 280 Ga. 95, 96 (623 SE2d 465) (2005). Under the FBPA, it is unlawful to represent "that goods or services are of a particular standard, quality, or grade . . . if they are of another[.]" OCGA § 10-1-393 (b) (7). The FBPA provides a private cause of action for an individual who suffers injury or damages as a result of a violation of the Act. See OCGA § 10-1-399 (a); see also *Henderson*, 280 Ga. at 96 ("[A] claim under the FBPA requires proof not only of deceptive

misconduct but also of conduct which affects the public interest.").

An individual bringing suit under the FBPA may seek injunctive relief and general damages, as well as exemplary damages for intentional violations of the Act. See OCGA § 10-1-399 (a).

Based on the Normans' complaint, they assert allegations supporting an FBPA claim that would not require a recognition of life as an injury. The Normans allege that Xytex made misrepresentations about the quality of their product (sperm) and services (screening process) to the public. As discussed above, we cannot say at this procedural posture that the Normans suffered no injury as a result. At a minimum, the Normans may have paid more for Donor #9623's sperm than it was really worth. And if the Normans can prove that they were injured by Xytex's deceptive conduct, the FBPA provides equitable relief to enjoin Xytex from continuing such deceptive practices. And, based on the allegation that one of Xytex's employee's encouraged, if not aided, Donor #9623 to falsify his background, the Normans may also be entitled to punitive damages. See OCGA § 10-1-399 (a) ("[E]xemplary damages

shall be awarded only in cases of intentional violation.").

Given the allegations in the complaint, the Normans have asserted at least some damages that are not necessarily dependent on recognizing A. A.'s life as an injury. As mentioned above, the standard for granting a motion to dismiss is a demanding one. A complaint need only give fair notice of the claim, and a motion to dismiss should be granted only when the complaint "shows with certainty that the plaintiff would not be entitled to relief under any state of facts that could be proved in support of the claim." *Lathem v. Hestley*, 270 Ga. 849, 850 (514 SE2d 440) (1999) (citation and punctuation omitted); see also *Ledford v. Meyer,* 249 Ga. 407, 408-409 (2) (290 SE2d 908) (1982) ("Under this 'notice' theory of pleading[,] it is immaterial whether a pleading states conclusions or facts as long as fair notice is given, and the statement of claim is short and plain." (citations and punctuation omitted)). Xytex has not made that showing here.

Although the Normans' complaint does not identify with specificity every injury they might have suffered, we must construe

all doubts in their favor. In this procedural posture, we cannot say with certainty that the Normans cannot prove a state of facts that would entitle them to any relief. To the extent that the Normans have pled claims predicated on injuries that are not predicated on life as an injury, these claims are not barred by *Graves* or *Abelson*.

The Court of Appeals failed to recognize that some of the damages sought by the Normans would not require a recognition of A. A.'s life as an injury. Therefore, we reverse the Court of Appeals's judgment that *Abelson* barred nearly all of the Normans' claims, and remand with instruction to determine whether and to what extent the Normans have adequately pled claims for relief that do not derive their injury from A. A.'s life itself; the Court of Appeals may make that determination itself or conclude that this would best be done by the trial court in the first instance and further remand the case for that purpose.

*Judgment affirmed in part and reversed in part, and case remanded with direction. All the Justices concur, except Ellington, J., disqualified.*

Decided September 28, 2020 — Reconsideration denied October 19, 2020.

Certiorari to the Court of Appeals of Georgia —— 350 Ga. App. 731.

*Heninger Garrison & Davis, William L. Garrison, Jr., James F. McDonough III; Hersh & Hersh, Nancy Hersh, Kate Hersh-Boyle; David B. Newdorf*, for appellants.

*FisherBroyles, Thomas E. Lavender III, Alison L. Currie, Andrew J. King*, for appellees.

*Timothy D. Lytton*, amicus curiae.